EBNB 70 PINE OWNER LLC,

Landlord

and

DOWN TOWN ASSOCIATION,

Tenant

_____

LEASE

_____

dated as of December ___, 2014

Portions of the 1st and 2nd Floors,
consisting of the "Downtown Unit" in the 70 Pine Street Condominium
70 Pine Street
New York, New York

# TABLE OF CONTENTS

Page

ARTICLE 1 DEMISE, RENT AND DEFINITIONS...........................................................1

ARTICLE 2 USE, COMPLIANCE AND SIGNS.............................................................15

ARTICLE 3 CONDITION OF PREMISES; ACCESS......................................................18

ARTICLE 4 TENANT TERMINATION OPTION ..........................................................21

ARTICLE 5 MEMORANDUM OF LEASE.....................................................................21

ARTICLE 6 SUBORDINATION TO MORTGAGES, LEASES,
            CONDOMINIUM AND DECLARATION OF RESTRICTIONS ........22

ARTICLE 7 QUIET ENJOYMENT .................................................................................27

ARTICLE 8 ASSIGNMENT, SUBLETTING AND MORTGAGING ............................28

ARTICLE 9 COMPLIANCE WITH LEGAL AND INSURANCE
            REQUIREMENTS ...............................................................................40

ARTICLE 10 INSURANCE...............................................................................................42

ARTICLE 11 RULES AND REGULATIONS ..................................................................48

ARTICLE 12 ALTERATIONS ..........................................................................................49

ARTICLE 13 LANDLORD'S AND TENANT'S PROPERTY; REMOVAL AT
            END OF TERM....................................................................................54

ARTICLE 14 REPAIRS AND MAINTENANCE .............................................................56

ARTICLE 15 ELECTRIC ENERGY ................................................................................59

ARTICLE 16 OTHER UTILITIES ...................................................................................63

ARTICLE 17 OTHER SERVICES; SERVICE INTERRUPTION ...................................64

i

Page

ARTICLE 18 ACCESS, NOTICE OF OCCURRENCES, WINDOWS, NAME
OF BUILDING AND NO DEDICATION .............................................. 65

ARTICLE 19 LIABILITY AND INDEMNIFICATION ................................... 70

ARTICLE 20 DAMAGE OR DESTRUCTION ................................................ 73

ARTICLE 21 EMINENT DOMAIN .................................................................. 76

ARTICLE 22 SURRENDER AND HOLDING OVER ................................... 79

ARTICLE 23 DEFAULT ...................................................................................... 81

ARTICLE 24 RE-ENTRY BY LANDLORD .................................................... 83

ARTICLE 25 DAMAGES .................................................................................... 84

ARTICLE 26 WAIVERS ..................................................................................... 88

ARTICLE 27 CURING TENANT'S DEFAULTS AND COSTS OF
ENFORCEMENT ......................................................................... 90

ARTICLE 28 BROKER ....................................................................................... 91

ARTICLE 29 NOTICES ...................................................................................... 91

ARTICLE 30 ESTOPPEL CERTIFICATES .................................................... 93

ARTICLE 31 FORCE MAJEURE ..................................................................... 94

ARTICLE 32 CONSENTS ................................................................................... 95

ARTICLE 33 RENT CONTROL ....................................................................... 95

ARTICLE 34 MISCELLANEOUS ..................................................................... 96

ARTICLE 35 SECURITY DEPOSIT ................................................................ 99

EXHIBITS:

Exhibit A – FLOOR PLAN(S) OF PREMISES

Exhibit B – COMMENCEMENT DATE AGREEMENT

Exhibit C – PLANS AND SPECIFICATIONS FOR LANDLORD'S WORK

Exhibit D – BASE RENT

Exhibit E – FORM OF CONDOMINIUM SNDA

Exhibit F – COPY OF SECURITY DEPOSIT AGREEMENT

LEASE, dated as of December ___, 2014 (the "**Lease Effective Date**"),
between EBNB 70 PINE OWNER LLC, a Delaware limited liability company, having its
principal office at c/o Rose Associates, 200 Madison Avenue, New York, NY 10016
(together with its successors and assigns, "**Landlord**") and DOWN TOWN
ASSOCIATION, a New York not-for-profit corporation, having an office at 60 Pine
Street, New York, NY 10005 ("**Tenant**").

For good and valuable consideration, the receipt and sufficiency of which
are hereby acknowledged, Landlord and Tenant hereby agree as follows:

## ARTICLE 1

## DEMISE, RENT AND DEFINITIONS

1.1    Landlord hereby leases to Tenant, and Tenant hereby hires from
Landlord, upon and subject to all of the terms and conditions of this Lease, those certain
portions of the first (1st) and second (2nd) floors, substantially as shown on the floor plan
attached hereto as Exhibit A (the "**Premises**"), which consist of the "Downtown Unit" in
the 70 Pine Street Condominium, in the building (the "**Building**") known by the street
address of 70 Pine Street, New York, New York. The Building, together with the land
comprising the tax lot(s) on which the Building is located (the "**Land**") are collectively
called the "**Property**". The parties agree that for all purposes of this Lease, the Premises
shall be conclusively deemed to have a total rentable area of 25,265 rentable square feet,
comprised of 200 rentable square feet on the first (1st) floor and 25,065 rentable square
feet on the second (2nd) floor.

1.2    (a)    The term of this Lease ("**Term**") shall commence on the Commencement Date (as hereinafter defined) and shall end at 11:59 p.m. on the Expiration Date (as hereinafter defined) , or on such earlier date upon which this Lease shall sooner terminate for any reason.

(b)    The "**Commencement Date**" of this Lease shall be the Master Lease End Date (as hereinafter defined), *provided* that, if the Master Lease End Date occurs prior to the occurrence of the Prior Lease Commencement Date, then the term "Commencement Date" shall mean the first date on which all of the following have occurred (each of the following, a "**Commencement Date Condition**"):  (i) Landlord's Work (as hereinafter defined) shall have been substantially completed (meaning that the stage of progress of Landlord's Work has been reached as shall leave only minor punchlist items to be performed that do not materially interfere with Tenant's intended use of the Premises (it being understood and agreed that Tenant shall be responsible to furnish the rooms in the Premises for their intended use)), (ii) a temporary or permanent certificate of occupancy for the Building, allowing hotel occupancy on the portion of the second (2nd) floor comprising the Premises, has been issued and all Building systems are in working order (the Commencement Date Condition described in this clause (ii), the "**CO Commencement Date Condition**"), (iii) a use permit for the Private Elevator (as defined below) has been issued and (iv) Landlord shall have delivered to Tenant vacant, broom clean possession of the Premises free of all occupants and rights of possession.  If the Master Lease End Date occurs prior to the occurrence of the Prior Lease Commencement Date, then, notwithstanding anything in this Lease to the contrary, if (x) all of the other Commencement Date Conditions, except the CO Commencement Date

Condition, have been met and (y) a temporary or permanent certificate of occupancy for the Building, allowing hotel occupancy on the portion of the second (2nd) floor comprising the Premises has not been issued due to a failure by Tenant to comply with its obligations under Section 1.2(j) and such failure continues for six (6) months after notice of such failure from Landlord to Tenant (the date that is six (6) months after such notice, the "**Deemed Commencement Date**"), then Tenant shall be deemed to have irrevocably waived the CO Commencement Date Condition for all purposes under this Lease and the Deemed Commencement Date shall constitute the Commencement Date for all purposes under this Agreement (and, for the avoidance of doubt, Tenant shall be required to pay Base Rent and all Additional Charges from and after such date as set forth in this Lease).

(c)    The term "**Master Lease End Date**" shall mean the earlier to occur of the following: (i) the day following the day on which the Master Lease (as hereinafter defined) expires, or (ii) the day following the day on which the Master Lease is terminated prior to the stated expiration date thereof.  For the avoidance of doubt, Landlord and Tenant acknowledge that it is the intent of the parties that the Term commence on the Master Lease End Date (assuming that the Prior Lease Commencement Date shall have occurred prior to the Master Lease End Date).

(d)    The term "**Master Lease**" shall mean that certain Master Lease, dated as of the Lease Effective Date, between Landlord, as landlord, and EBRA 70 Pine Master Tenant LLC (together with its successors and assigns, "**Master Tenant**"), as tenant, pursuant to which Landlord has leased the Property (including the Premises) to Master Tenant, as the same may be amended, restated or otherwise modified from time to time.

(e)    The term "**Prior Lease Commencement Date**" shall mean
the "Commencement Date" as defined in the Prior Lease (as hereinafter defined),
*provided* that, if the Prior Lease Commencement Date shall not have occurred prior to the
occurrence of the Commencement Date, then, for the purposes of the definition of
"Expiration Date", Exhibit D, the definition of "Adjusted for Inflation", Section 6.2,
Section 8.16, Section 10.3 and Section 10.4, the term "Prior Lease Commencement Date"
shall mean the Commencement Date.

(f)    The term "**Prior Lease**" shall mean that certain Lease,
dated as of April 26, 2013, between Master Tenant (as successor by assignment to
Landlord), as landlord, and Tenant, as tenant, as amended pursuant to that certain First
Amendment to Lease, dated as of July 24, 2013, as further amended and assigned
pursuant to that certain Second Amendment to Lease, Subordination of Lease and
Assignment of Lease, dated as of the Lease Effective Date, and as amended and restated
pursuant to that certain Amended and Restated Lease, dated as of the Lease Effective
Date, pursuant to which Tenant has leased the Premises from Master Tenant, as the same
may be further amended, restated or modified from time to time.

(g)    The term "**Expiration Date**" shall mean the day
immediately preceding the forty-nine (49) year anniversary of the Prior Lease
Commencement Date (as hereinafter defined) (the "**Expiration Date**").

(h)    Notwithstanding any provision of this Lease:

(i)    if (x) the Master Lease End Date occurs prior to the
occurrence of the Prior Lease Commencement Date and (y) the Commencement Date
shall not occur on or before August 26, 2014 (except to the extent such delay was due to

the improper acts or improper omissions of Tenant, including, without limitation, a failure of Tenant to comply with its obligations under Section 1.2(j)), then Tenant shall be entitled to an abatement of Base Rent equal to the number of days from and including August 26, 2014 to and including the Commencement Date; if Tenant shall be entitled to an abatement of the "Base Rent" as defined in the Prior Lease pursuant to Section 1.2(c)(i) of the Prior Lease and such abatement shall not have been fully credited against the "Base Rent" (as defined in the Prior Lease) prior to the occurrence of the Master Lease End Date, the remaining amount of such abatement shall be credited against the Base Rent payable under this Lease; and

(ii)    if (x) the Master Lease End Date occurs prior to the occurrence of the Prior Lease Commencement Date and (y) the Commencement Date shall not occur on or before January 26, 2016 (except to the extent such delay was due to the improper acts or improper omission of Tenant, including without limitation, a failure of Tenant to comply with its obligations under Section 1.2(j)), then, in addition to Tenant's right to abatement of Base Rent pursuant to Section 1.2(h)(i) above, the Base Rent for the period commencing on the one (1) year anniversary of the Commencement Date through and including the day immediately prior to the two (2) year anniversary of the Commencement Date shall be $875,000 (and not $892,000; including for the purposes of paragraph 1(c) of Exhibit D); also, if Tenant is entitled to a reduction in the "Base Rent" (as defined in the Prior Lease) pursuant to Section 1.2(c)(ii) of the Prior Lease and the Master Lease End Date occurs after the occurrence of the Prior Lease Commencement Date but during the first or the second year of the term of the Prior Lease, then the Base Rent payable under this Lease for the period commencing on the

one (1) year anniversary of the Prior Lease Commencement Date through and including the day immediately prior to the two (2) year anniversary of the Prior Lease Commencement Date shall be $875,000 (and not $892,000; including for the purposes of paragraph 1(c) of Exhibit D); and

(iii)     if (x) the Master Lease End Date occurs prior to the occurrence of the Prior Lease Commencement Date and (y) the Commencement Date shall not occur on or before April 26, 2016 (such date, the "**Delivery Deadline Date**"), then either Tenant or Landlord shall have the right to terminate this Lease, *provided*, *however*, that if the delay in the occurrence of the Commencement Date is due to the improper acts or improper omissions of Tenant, including, without limitation, a failure of Tenant to comply with its obligations under Section 1.2(j), then Tenant shall have no right to terminate this Lease.  Upon termination of this Lease by either Tenant or Landlord pursuant to and in accordance with this Section 1.2(h)(iii), Landlord shall pay to Tenant an amount equal to ONE MILLION DOLLARS ($1,000,000), *provided*, *however*, that if the delay in the occurrence of the Commencement Date is due to the deliberate attempt by Landlord to deprive Tenant of Tenant's rights under this Lease, then, upon termination of this Lease by either Tenant or Landlord pursuant to and in accordance with this Section 1.2(h)(iii), Landlord shall pay to Tenant an amount equal to TWO MILLION DOLLARS ($2,000,000) (instead of $1,000,000); if the Prior Lease is terminated pursuant to Section 1.2(c)(iii) of the Prior Lease, this Lease shall automatically terminate simultaneously with such termination of the Prior Lease (for the avoidance of doubt, but without limiting any obligation of Landlord to make any such payment pursuant to the Prior Lease, it being understood that, upon any such automatic,

simultaneous termination of this Lease, Landlord shall not have an obligation to make any payment to Tenant pursuant to this Lease).

(i)     Landlord shall provide Tenant with reasonable advance notice of the anticipated Commencement Date, and Landlord and Tenant shall resolve any dispute over the Commencement Date promptly and in good faith.  Promptly after the Commencement Date has been mutually determined, Landlord and Tenant shall join with each other in the execution and delivery of a written agreement substantially in the form of Exhibit B attached hereto (but any failure to execute and deliver the same shall not affect the determination of the Commencement Date).

(j)     Notwithstanding anything in this Lease to the contrary, Tenant shall cooperate, as reasonably requested, with Landlord's (or, so long as the Prior Lease is in full force and effect, Master Tenant's) efforts to obtain a certificate of occupancy for the Building that allows for hotel occupancy on the portion of the second (2nd) floor comprising the Premises, including, without limitation, Tenant's performing of any work in 60 Pine Street (including, without limitation, any work required with respect to the fire alarm system in 60 Pine Street), at Tenant's cost and expense, as may be required to obtain such certificate of occupancy.

(k)     If the Master Lease End Date occurs prior to the occurrence of the Prior Lease Commencement Date or if all of the "Purchlist Work" as defined in the Prior Lease has not been completed prior to the Commencement Date, then, (i) within thirty (30) days after the Commencement Date, Tenant shall deliver to Landlord a punchlist of minor items of unfinished or improperly performed Landlord's Work ("**Punchlist Work**"), (ii) at Landlord's sole cost, Landlord shall promptly and diligently

complete, correct, repair or replace, as applicable, any unfinished or improperly performed items of Landlord's Work set forth in such punchlist, (iii) Landlord shall endeavor to complete Landlord's Work as soon as reasonably practicable after receipt of Punchlist Work, and (iv) Tenant shall permit reasonable access to the Premises at reasonable times (as mutually agreed by Landlord and Tenant, each in their reasonable discretion) for performance by Landlord and/or its representatives of Punchlist Work.

      1.3     The rents shall consist of:

      (i)     Base Rent ("**Base Rent**") at the applicable rates set forth in Exhibit D attached hereto, which Base Rent shall be payable in equal monthly installments in advance on the first (1st) day of each and every calendar month during the Term, except that, if the Master Lease End Date occurs prior to the day immediately prior to the first (1st) anniversary of the Prior Lease Commencement Date, the First Year Base Rent Lump Sum (as hereinafter defined) shall be payable in full, in arrears, on the First Year End Date (as hereinafter defined); the term "**First Year Base Rent Lump Sum**" shall mean an amount equal to the Base Rent payable under this Lease for the period commencing on the Commencement Date and ending on the First Year End Date; and the term "**First Year End Date**" shall mean (i) if the Prior Lease Commencement Date occurred prior the Master Lease End Date, the last day of the first (1st) year of the term of the Prior Lease and (ii) otherwise, the last day of the first year of the Term; and

      (ii)     additional rent ("**Additional Charges**") consisting of all other sums of money that become due from Tenant and payable to Landlord hereunder. All Base Rent and Additional Charges shall be paid in lawful money of the United States

to Landlord by good and sufficient check (subject to collection) drawn on a bank which is a member of the New York Clearinghouse Association, at Landlord's address set forth above, or such other place as Landlord shall hereafter designate from time to time by Notice to Tenant.

1.4    The parties agree that no escalations or other payments in respect of real estate taxes shall be payable by Tenant hereunder, and that Landlord (or, so long as the Prior Lease is in full force and effect, Master Tenant) shall be responsible for all real estate taxes in respect of the Property (*provided*, *however*, that this sentence shall not limit the provisions of Paragraph 2 of Exhibit D).  Notwithstanding the foregoing (or any other provision of this Lease), Tenant shall be responsible for any and all commercial occupancy and rent taxes, hotel occupancy taxes, sales taxes and use taxes relating to the Premises, and any other like taxes, each as applicable.

1.5    Tenant shall pay Base Rent and Additional Charges promptly when due without notice or demand therefor and without any abatement, deduction or setoff for any reason except as otherwise expressly provided in this Lease.   Landlord shall have the same remedies for default in payment of Additional Charges as Landlord has for default in payment of Base Rent.  If the Commencement Date or Expiration Date occurs on a day other than the first or last day of a calendar month, as applicable, Base Rent for the partial calendar month shall be prorated.

1.6    No payment by Tenant or receipt or acceptance by Landlord of a lesser amount than the correct Base Rent or Additional Charges shall be deemed to be other than a payment on account, nor shall any endorsement or statement on any check or any letter accompanying any check or payment be deemed an accord and satisfaction, and

Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance or pursue any other remedy provided in this Lease or at law.

      1.7     If Tenant fails to make any payment of Base Rent or Additional Charges within five (5) Business Days after the due date thereof, such unpaid amount shall bear interest from the due date at a rate ("**Lease Interest Rate")** equal to the lesser of (a) the rate announced by JP Morgan Chase Bank, or its successor, from time to time as its prime or base rate ("**Prime Rate**") plus three hundred fifty (350) basis points, or (b) the maximum applicable rate allowed by law, from the date such amount became due and payable to the date of payment thereof by Tenant.  Such interest shall be due and payable on demand.

      1.8     The following terms, whenever used in this Lease (including all exhibits attached hereto, all of which shall be deemed to be a part of this Lease), shall have the meanings indicated:

      (a)     The term "**Adjusted for Inflation**" shall mean, with respect to any amount, that there shall be added to such amount (as the same may have been previously adjusted), beginning on the Prior Lease Commencement Date and every fifth (5th) anniversary thereof (each such five (5) year period, a "**Specified Interval**"), an amount equal to the product of (A) such sum (as the same may have been previously adjusted) and (B) a fraction (1) the numerator of which is the difference between (a) the CPI for the calendar month that is three (3) months immediately preceding the calendar month in which the Specified Interval for which such calculation is being made ended and (b) the CPI for the calendar month that is three (3) months immediately preceding the

calendar month in which the immediately preceding Specified Interval ended (or, in the case of the first Specified Interval, the calendar month in which the Prior Lease Commencement Date occurred) and (2) the denominator of which is the CPI for the calendar month that is three (3) months immediately preceding the calendar month in which the immediately preceding Specified Interval ended (or, in the case of the first Specified Interval, the calendar month in which Prior Lease Commencement Date occurred).

(b)     The term "**Business Days**" shall mean such Mondays, Tuesdays, Wednesdays, Thursdays and Fridays that do not fall on the days celebrated as New Year's Day, Martin Luther King Day, Presidents' Day, Memorial Day, Independence Day, Labor Day, Columbus Day, Veterans Day, Thanksgiving Day, day after Thanksgiving or Christmas Day, or on such other days on which there is no regular United States postal service or the New York Stock Exchange (or any successor thereto) is closed.

(c)     The term "**CPI**" shall mean the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics of the United States Department of Labor, New York-Northern New Jersey-Long Island, NY-NJ-CT area, All Items [1982-1984=100], or any successor thereto appropriately adjusted.  If the Consumer Price Index ceases to be published, and there is no successor thereto, such other index as Landlord and Tenant reasonably agree upon, as appropriately adjusted, shall be substituted for the Consumer Price Index.

(d)     The term "**control**" shall mean, (i) in the case of a corporation, the ownership of not less than fifty one percent (51%) of all of the voting

stock of such corporation, or (ii) in the case of any other business entity, the ownership of

not less than fifty one percent (51%) of all of the legal and equitable interest in such

business entity.

(e)    The term "**Eligible Guest**" shall mean (i) Tenant's

members, (ii) members of affiliated or otherwise associated clubs or associations, (iii)

individuals attending events or functions at 60 Pine Street, (iv) other people with a bona

fide direct or indirect relationship with Tenant or Tenant's members, and (iv) family

members or other bona fide guests of any of the foregoing.  Eligible Guests do not

include members of the general public who do not have a bona fide relationship to

Tenant, affiliated or otherwise associated clubs or associations or 60 Pine Street,

*provided*, *however*, that, if, in accordance with the terms of this Lease, Tenant has

assigned its interest in this Lease, or subleased the Premises, to a hotel operator that has

not less than ten (10) years' experience in owning or operating hotels in major

metropolitan areas of at least "four star" quality, then during such time as such assignee

or sublessee, as applicable, is the Tenant or the sublessee of the Premises, as applicable,

and operates a hotel of at least "four star" quality at the Premises in accordance with the

terms of this Lease, the term 'Eligible Guest' shall also mean hotel guests of such

assignee or sublessee, as applicable.

(f)    The term "**Hotel Room**" shall mean a guest room or suite

(which may include kitchen facilities).

(g)    The term "**Insurance Requirements**" shall mean rules,

regulations, orders and requirements of the New York Board of Fire Underwriters, the

New York Fire Insurance Rating Organization and any other similar body performing the

same or similar functions, whether now or hereafter in force, and requirements of any

insurance policy maintained by Landlord at any time or of the issuer of such policy.

(h)    [Intentionally Deleted.]

(i)    The term "**Landlord Party**" shall mean Landlord, each

Superior Lessor and Superior Mortgagee, and their respective partners, members,

directors, officers, agents and employees.

(j)    The term "**Landlord's Work**" shall mean all of the

following, which shall be completed at Landlord's sole cost and expense in good and

workmanlike manner to the extent not so completed by Landlord or Master Tenant

pursuant to the Prior Lease prior to the Master Lease End Date:

(i)    the construction of Hotel Rooms (including

bathroom fixtures, fire safety systems and devices,

and heat pumps) in the Premises and ancillary

spaces;

(ii)    the installation of an opening (including fire doors)

between the first (1st) floor portion of the Premises

and the currently-existing cloak room on the first

(1st) floor of 60 Pine Street(such opening, the

"**Cloak Room Opening**");

(iii)    the installation of a private elevator providing

service between the first (1st) and second (2nd) floor

portions of the Premises (the "**Private Elevator**");

and

(iv)    the installation of an opening (including fire doors) from the second (2nd) floor portion of the Premises to the 2nd floor of 60 Pine Street to provide access to the service elevator currently located at 60 Pine Street (such opening, the "**Service Elevator Access**"),

all in compliance with applicable Legal Requirements and the plans and specifications attached to this Lease as Exhibit C, it being understood and agreed that Landlord's Work shall not include furniture, hotel supplies (such as linens) or gym equipment and that Tenant shall be responsible for furnishing and supplying the guest rooms in the Premises for their intended use.

(k)    The term "**Legal Requirements**" shall mean (i) laws and ordinances of federal, state, city, town, county, borough and village governments and rules, regulations, orders and directives of all departments, subdivisions, bureaus, agencies or offices thereof, and of any other governmental, public or quasi-public authorities, and the directions of any public officers pursuant to law, whether now or hereafter in force and (ii) requirements and other provisions of the Condominium Declaration (as hereinafter defined).

(l)    The term "**Tenant**" shall mean the Tenant initially named in this Lease or any permitted assignee or other permitted successor in interest (immediate or remote) of the such Tenant initially named in this Lease that at the time in question is the holder of the tenancy under this Lease.

(m)    The term "**Tenant's Affiliate**" shall mean any corporation or other business entity which controls, is controlled by, or is under common control with Tenant.

(n)    The term "**Tenant's Property**" shall have the meaning set forth in Section 13.2 below.

(o)    The term "**not unreasonably withheld**" (or "**not be unreasonably withheld**") shall mean not unreasonably withheld, delayed or conditioned (or not be unreasonably withheld, delayed or conditioned).

## ARTICLE 2

## USE, COMPLIANCE AND SIGNS

2.1    The Premises shall be used and occupied solely as hotel or temporary occupancy rooms and ancillary club use, all on a temporary basis (not to exceed thirty (30) consecutive nights by any individual), only for Eligible Guests, in compliance with Legal Requirements and the further provisions of this Article 2.

2.2    (a)    If any governmental license or permit is required for the proper and lawful conduct of Tenant's use of the Premises (other than a certificate of occupancy and a use permit for the Private Elevator), Tenant, at its expense, shall procure and maintain such license or permit and submit the same to Landlord for inspection upon Landlord's request from time to time, and, to the extent any information or action is reasonably required of Landlord in connection therewith, Landlord agrees to perform such action or deliver such information, at Tenant's sole cost and expense, as soon as practicable.  Tenant shall at all times comply with the terms and conditions of each such license or permit.  Tenant shall not use, or suffer or permit any person to use, the

Premises, or any part thereof, in any manner which (a) violates the certificate of

occupancy for the Premises (allowing hotel occupancy on the portion of the second (2nd)

floor comprising the Premises) or for the Building or any other permit or license issued

pursuant to any Legal Requirements, (b) causes injury to the Building, (c) constitutes a

violation of the Legal Requirements or Insurance Requirements pursuant to Article 9,

(d) impairs the character, reputation or appearance of the Building as a first-class

residential and/or hotel building, (e) impairs the proper and economic maintenance,

operation and repair of the Building, or (f) unreasonably and materially annoys or

inconveniences other tenants, users or guests of the Building.

(b)    At all times from and after the Commencement Date,

Landlord shall, at Landlord's cost and expense, use commercially reasonable efforts to

maintain a certificate of occupancy for the Building that allows for hotel occupancy on

the portion of the second (2nd) floor comprising the Premises and use commercially

reasonable efforts to convert any temporary certificate of occupancy for the Premises that

allows for hotel occupancy on the portion of the second (2nd) floor comprising the

Premises to a permanent certificate of occupancy, *provided* that, except as expressly

provided in Section 1.8(j)(ii) or Section 1.8(j)(iv) (i) such commercially reasonable

efforts under no circumstances shall be deemed to require Landlord to perform any work,

or expend any amount with respect to any work, in 60 Pine Street and (ii) Tenant shall

cooperate therewith as reasonably requested (including, without limitation, by Tenant's

performing any work in 60 Pine Street, at Tenant's cost and expense, as may be required

in order to maintain such certificate of occupancy).  If at any time after the

Commencement Date a certificate of occupancy for the Premises does not allow hotel

occupancy on the portion of the second (2nd) floor comprising the Premises and Tenant receives notice that it cannot legally occupy the Premises, then Tenant shall have the right to terminate this Lease upon five (5) Business Days' prior notice to Landlord, *provided*, *however*, that Tenant shall have no right to terminate this Lease if a certificate of occupancy allowing hotel occupancy on the portion of the second (2nd) floor comprising the Premises has been revoked or not been renewed due to any act or omission of Tenant or due to any breach of this Lease by Tenant (including, without limitation, any failure of Tenant to comply with its obligations under this Section 2.2(b), Article 12 or Article 14); if the Prior Lease is terminated pursuant to Section 2.2(b) of the Prior Lease, this Lease shall automatically terminate simultaneously with such termination of the Prior Lease.

       2.3     Notwithstanding any provision of this Lease, the following are expressly prohibited at the Premises:

       (a)     any rental or use of any Hotel Room on an "hourly" basis;

       (b)     the rental or use of any Hotel Room by any individual or entity for more than thirty (30) consecutive nights;

       (c)     the rental or use of any Hotel Room by any individual or entity other than an Eligible Guest, it being expressly understood and agreed that the Hotel Rooms at the Premises are not to be offered or marketed to the general public except as otherwise expressly provided in Section 1.8(e);

       (d)     the sale, lease, sublease, license, sublicense or other granting of usage rights to Hotel Rooms for ongoing residential use, fractional unit interests, time share arrangements or vacation club memberships; and

(e)     any rentals that are, or may be deemed by applicable law to be, subject to the jurisdiction of the Rent Stabilization Law or Rent Stabilization Code.

2.4     Tenant may not place signs anywhere in or on the Property other than in the interior of the Premises, without (in each case) the prior consent of Landlord (or, so long as the Prior Lease is in full force and effect, of Master Tenant) (it being expressly agreed that the labeling of Hotel Rooms and the placement of directional and identification signage, all in a customary manner, shall not require consent).  In no event shall Tenant place any signs on the exterior of the Building.

## ARTICLE 3

### CONDITION OF PREMISES; ACCESS

3.1     Tenant hereby agrees to accept the Premises in its current condition, "as is," without requiring any improvements or decorations to be made by Landlord, except that Landlord shall perform (or cause to be performed) Landlord's Work, at Landlord's sole cost and expense (to the extent Landlord's Work shall not have been completed by Landlord or Master Tenant pursuant to the Prior Lease prior to the Master Lease End Date), and, if the Commencement Date occurs prior to the Prior Lease Commencement Date, shall deliver the Premises to Tenant vacant, broom clean, free of all occupants and rights of possession with the Building systems in working order.

3.2     Notwithstanding any provision of this Lease to the contrary, access to the Premises shall be provided exclusively by the Cloak Room Opening and the Service Elevator Access, as well as emergency egress via dedicated stairs exiting into the main first (1st) floor lobby of the Building or such other emergency egress through the Building as may be required by applicable law, in which event, Landlord (or, so long as

the Prior Lease is in full force and effect, Master Tenant) and Tenant shall reasonably

cooperate to provide such other emergency egress. No other access shall be provided

(including, without limitation, to the Building lobby, to the Building elevators or stairs, or

to the outside), but (if Landlord's freight elevators are then operational and reasonably

available) Landlord shall cooperate (as reasonably requested, and at no cost to Tenant) to

make Landlord's freight elevators available to Tenant for a reasonable amount of time (i)

during Tenant's initial move-in to the Premises (if the Commencement Date occurs prior

to the Prior Lease Commencement Date) and (ii) otherwise during the Term to the extent

necessary for Tenant to move Tenant's Property into and out of the Premises in

accordance with the terms of this Lease. Landlord shall not permit any of the elevators

servicing 70 Pine Street except the Private Elevator to open onto the Premises.

        3.3     Tenant is the current fee owner of certain property adjacent to the

Property commonly known as 60 Pine Street, New York, New York ("**60 Pine Street**").

If, at any time and for any reason, the then-current Tenant under this Lease is not the fee

owner of 60 Pine Street or the condominium unit owner, lessee, sublessee or licensee of

both (a) the cloak room adjoining the Cloak Room Opening and (b) the service elevator

adjoining the Service Elevator Access, then Tenant shall be in default under this Lease.

        3.4     Landlord (i) acknowledges that, pursuant to Section 36.1 of the

Prior Lease (as in effect as of the Effective Date), if the term of the Prior Lease ends on

the earlier of: (x) December 31, 2049 and (y) the day on which the Master Lease is

terminated prior to the stated expiration date thereof (such earlier date, the "**Prior Lease**

**Expiration Date**"), then Tenant shall not be required to (A) remove Tenant's Property

from the Premises pursuant to Section 13.2 of the Prior Lease, (B) remove any non-

standard Alterations Tenant pursuant to Section 13.3 of the Prior Lease, (C) quit and surrender the Premises to Landlord pursuant to Section 22.1 of the Prior Lease, (D) permanently close the Cloak Room Opening and the Service Elevator Access from the 60 Pine Street side pursuant to Section 22.1 of the Prior Lease, or (E) make any holdover payment to Master Tenant pursuant to Section 22.2 of the Prior Lease (such requirements, collectively, the "**Prior Lease Surrender Obligations**"), *provided* that Tenant shall (1) cause all insurance coverage required to be maintained by Tenant pursuant to the terms of the Prior Lease to continue in full force and effect through the day following the Prior Lease Expiration Date and (2) pay any charges for use of electrical energy in the Premises through such date and (ii) agrees that Tenant shall not be required to satisfy any of the Prior Lease Surrender Obligations pursuant to the terms of the Prior Lease, and Landlord shall not take any action against Master Tenant or Tenant as a result of Tenant not meeting any of the Prior Lease Surrender Obligations pursuant to the terms of the Prior Lease, in each case, *provided* that this Lease shall be in full force and effect on the Prior Lease Expiration Date.  Nothing contained in this Section 3.4 shall be deemed to limit or modify any obligations of Tenant upon the expiration or earlier termination of the Term of this Lease pursuant to the terms of this Lease, including, without limitation, Section 13.2, Section 13.3, Section 22.1 or Section 22.2.

3.5    Landlord (i) acknowledges and agrees that pursuant to Section 36.2 of the Prior Lease (as in effect as of the Effective Date), if the term of the Prior Lease ends on the Prior Lease Expiration Date, then Master Tenant (x) shall not be required or permitted to close the Cloak Room Opening and the Service Elevator Access from the Building side; and (ii) agrees that Landlord shall not take any action against Master

Tenant or Tenant as a result of Master Tenant not closing the Cloak Room Opening and the Service Elevator Access, if this Lease shall be in full force and effect on the Prior Lease Expiration Date.

## ARTICLE 4

## TENANT TERMINATION OPTION

4.1    [Intentionally Deleted.]

## ARTICLE 5

## MEMORANDUM OF LEASE

5.1    This Lease shall not be recorded.  However, concurrently with the execution and delivery of this Lease, Landlord and Tenant shall execute, acknowledge and deliver a memorandum of this Lease, in proper form for recordation, together with such New York State and New York City transfer tax forms as may be required for Tenant to record the memorandum of this Lease in the Office of the City Register for New York County as set forth below in this Section 5.1 (and thereafter Landlord and Tenant shall execute, acknowledge and deliver a memorandum of each modification of this Lease, in proper form for recordation), together with any required transfer tax or other forms required for recordation of the memorandum of this Lease.  Each such memorandum shall be in form and substance reasonably acceptable to Landlord and Tenant.  Tenant shall be responsible for recording each such memorandum, at Tenant's sole cost and expense.

5.2    If an Event of Default occurs hereunder and, as a result thereof, this Lease is terminated or if this Lease otherwise terminates or is terminated pursuant to

the terms hereof, Landlord shall have the right to execute an affidavit or statement to be recorded in the appropriate land records terminating such memorandum (and Tenant shall cooperate therewith).

    5.3    Except for a memorandum of this Lease in accordance with Section 5.1, any subordination, non-disturbance and attornment agreements in accordance with Section 6.2, the Condominium SNDA in accordance with Section 6.5 and, during the term of the Prior Lease, any memoranda and subordination, non-disturbance and attornment agreements Tenant is permitted to record under the terms of the Prior Lease, Tenant shall not record any agreements against the Land or Tenant's leasehold interest, without the prior written consent of Landlord (in Landlord's sole discretion) in each case.

## ARTICLE 6

### SUBORDINATION TO MORTGAGES, LEASES, CONDOMINIUM AND DECLARATION OF RESTRICTIONS

    6.1    This Lease and all rights of Tenant hereunder shall be subject and subordinate to all ground leases, superior leases and underlying leases of the Land and/or the Building now or hereafter existing (other than the Master Lease) and to all mortgages now or hereafter existing affecting the Land and/or the Building and/or any of such leases, whether or not such mortgages also cover other lands and/or buildings and/or leases, to each and every advance made or hereafter to be made under such mortgages, and to all renewals, modifications, replacements and extensions of such leases and mortgages, and spreaders and consolidations of such mortgages.  This Section 6.1 shall be self-operative and no further instrument of subordination or priority (as described in

the first sentence of this Section 6.1) shall be required except as otherwise expressly set forth in this Lease.  In confirmation of such subordination or priority, Tenant shall promptly execute, acknowledge and deliver any instrument that Landlord, the lessor under any such lease or the holder of any such mortgage may reasonably request to evidence such subordination or priority.  Any lease to which this Lease is subject and subordinate is herein called a "**Superior Lease**," and the lessor of a Superior Lease is herein called a "**Superior Lessor**."  Any mortgage to which this Lease is subject and subordinate is herein called a "**Superior Mortgage**" and the holder of a Superior Mortgage is herein called a "**Superior Mortgagee**."

6.2     If any act or omission of Landlord would give Tenant the right, immediately or after lapse of a period of time, to cancel or terminate this Lease, or to claim a partial or total eviction, Tenant shall not exercise such right until thirty (30) days after the later of (a) the date Tenant gives notice of such act or omission to Landlord and to each Superior Mortgagee and Superior Lessor whose name and address were previously furnished to Tenant in writing from Landlord or from such Superior Mortgagee or Superior Lessor (if any), and (b) the date when such Superior Mortgagee or Superior Lessor becomes entitled under such Superior Mortgage or Superior Lease to remedy same (for the avoidance of doubt, clause (b) of this first sentence of this Section 6.2 does not apply to any termination of this Lease by Tenant pursuant to and in accordance with Section 1.2(h)(iii)).  Landlord hereby represents to Tenant that, as of the date of this Lease, there is no Superior Lessor and the only Superior Mortgagee is The Bank of New York Mellon, as administrative agent (the "**Initial Superior Mortgagee**").  Notwithstanding any provision of this Article 6, the subordination of this Lease to any

Superior Mortgage or Superior Lease is conditioned on Landlord's obtaining a

subordination, non-disturbance and attornment agreement from the applicable Superior

Mortgagee or Superior Lessor, on such Superior Mortgagee's or Superior Lessor's then-

current standard form, *provided*, *however*, that any subordination, non-disturbance and

attornment agreement entered into with any Superior Lessor prior to the Prior Lease

Commencement Date shall provide that such Superior Lessor shall be bound by <u>Section</u>

<u>1.2(h)</u> and any such then-current standard form of non-disturbance and attornment

agreement of any Superior Lessor shall be subject to such commercially reasonable

changes as Tenant may reasonably request.  To the extent (if any) of any conflict between

any such subordination, non-disturbance and attornment agreement and this Lease, the

terms and conditions of such subordination, non-disturbance and attornment agreement

shall govern and control.

   6.3 Tenant covenants and agrees that if for any reason a Superior

Lease (including a Superior Lease through which Landlord derives its leasehold estate in

the Premises) is terminated, or if the holder of a Superior Mortgage succeeds to the

interest of Landlord hereunder, then at the option of the then holder of the reversionary

interest in the Premises demised by this Lease, Tenant will attorn to such holder and will

recognize such holder as the Tenant's landlord under this Lease, except that such holder

shall not be (i) liable for any previous act or omission of Landlord under this Lease,

(ii) subject to any offsets or defenses, not expressly provided in this Lease, which

theretofore accrued to the Tenant against Landlord, (iii) liable for any security deposited

by Tenant which has not been transferred to such holder, (iv) bound by any previous

prepayment of more than one month's rent, (v) bound by any covenant to undertake or

complete any construction of the Premises or any portion thereof demised by this Lease, (vi) bound by any obligation to make any payment to, or on behalf of, the Tenant or provide any services or perform any repairs, maintenance or restoration provided for under this Lease to be performed before the date that such holder succeeded to the interest of Landlord under this Lease or bound by any obligation to make any payment to Tenant with respect to construction performed by, or on behalf of, Tenant at the Premises, and (vii) bound by any obligation to repair, replace, rebuild or restore the Premises demised in the event of damage by fire or other casualty, or in the event of partial condemnation, in any such case in excess of the insurance proceeds or condemnation award actually collected by such holder; *provided, however*, that such holder shall be responsible for the provisions of <u>Section 1.2(h)</u>, to the extent (if any) that the same are applicable and have not yet been performed by Landlord.  Tenant agrees to execute and deliver, at any time and from time to time, upon the request of Landlord or of the lessor under any such Superior Lease or holder of any Superior Mortgage any commercially reasonable instrument which may be necessary or appropriate to evidence such attornment. Tenant further waives the provision of any statute or rule of law now or hereafter in effect which may give or purport to give the Tenant any right of election to terminate this Lease or to surrender possession of the Premises in the event any proceeding is brought by the lessor under any Superior Lease or holder of a Superior Mortgage to terminate the same, and agrees that unless and until such lessor, in connection with any such proceeding, shall elect to terminate this lease and the rights of Tenant hereunder, this Lease shall not be affected in any way whatsoever by any such proceeding.

6.4    If any prospective or actual Superior Mortgagee or Superior Lessor requires any modification of this Lease, Tenant shall, upon notice thereof from Landlord, promptly execute and deliver to Landlord the instrument accompanying said notice from Landlord to effect such modification if such instrument does not adversely affect (other than to a de minimis extent) any of Tenant's rights under this Lease and does not increase (other than to a de minimis extent) any of Tenant's obligations under this Lease.

6.5    Tenant acknowledges and agrees that the Property (including the Premises) is subject to a condominium form of ownership.  This Lease and all rights of Tenant hereunder are and shall be subject and subordinate in all respects to the declaration pursuant to which Landlord has subjected the Property to a condominium form of ownership, any by-laws promulgated under such declaration and any other documents effectuating any condominium structure for the Property (collectively, the **"Condominium Declaration"**).    Upon the Lease Effective Date, Tenant and the condominium board shall execute, acknowledge and deliver a subordination, non-disturbance and attornment agreement in the form of Exhibit E attached hereto (the **"Condominium SNDA"**).

6.6    For the avoidance of doubt, Landlord shall have the right, at any time, in Landlord's sole discretion, to remove the Property (or any portion thereof) from the condominium form of ownership and to combine any condominium units in the Building (including the Condominium Unit with any other condominium units in the Building), in each case, at any time, in Landlord's sole discretion, *provided* that any such action by Landlord does not adversely impact the demising of, or the services provided to, the Premises to Tenant pursuant to this Lease or Tenant's rights or obligations under

this Lease.   Upon any removal of the Property (or any portion thereof) from any condominium form of ownership or combining of any condominium units in the Building, Tenant shall reasonably co-operate with Landlord to the extent necessary to effectuate such submission, removal or combining, as applicable, *provided* that the demising of the Premises to Tenant pursuant to this Lease and Tenant's rights  and obligations under this Lease are not adversely impacted thereby.

6.7    Tenant hereby irrevocably waives all rights it has, if any, in connection with any zoning lot merger or transfer of development rights in respect of the Property, including any rights it has to be a party to, to contest, or to execute, any declaration of restrictions which would cause the Property to be merged with any other zoning lot, except to the extent any such merger or transfer affects Tenant's property located at 60 Pine Street, New York, NY.  This Lease shall be subject and subordinate to any declaration of restrictions or any other document of similar nature and purpose now or hereafter affecting the Property *provided* that the same do not adversely affect (other than in a de minimis manner) any of Tenant's rights or obligations hereunder.  In confirmation of such waiver and subordination, Tenant shall promptly execute, acknowledge and deliver any instrument that Landlord reasonably requests.

## ARTICLE 7

## QUIET ENJOYMENT

7.1    So long as Tenant pays all Base Rent and Additional Charges, in each case within any notice and grace periods provided for in this Lease, and so long as this Lease is full force and effect, Tenant shall peaceably and quietly have, hold and enjoy the Premises without hindrance, ejection or molestation by Landlord or any person

claiming through or under Landlord, subject to the provisions of this Lease and to any

Superior Leases and Superior Mortgages and, so long as the Prior Lease is in full force

and effect, subject to the provisions of the Prior Lease.  This covenant shall be construed

as a covenant running with the Land and shall not be construed as a personal covenant of

Landlord except to the extent of Landlord's interest in this Lease.


## ARTICLE 8

### ASSIGNMENT, SUBLETTING AND
### MORTGAGING


8.1     Except as otherwise expressly provided herein, Tenant shall not,

voluntarily, involuntarily, by operation of law or otherwise, except with the prior consent

of Landlord (or, so long as the Prior Lease is in full force and effect, of Master Tenant):

(a) assign or otherwise transfer this Lease, (b) sublet the Premises or any part thereof, (c)

allow the Premises or any part thereof to be used, occupied or utilized by any person

other than Tenant or Eligible Guests or (d) mortgage, pledge, encumber or otherwise

hypothecate this Lease.  For avoidance of doubt, in no event shall this Lease or any part

of the Premises be included in any mortgage, pledge, encumbrance or hypothecation of

60 Pine Street.

8.2     (a) If and so long as Tenant is a corporation, a partnership or a

limited liability company, the following shall be deemed to be an assignment of this

Lease under Section 8.1 prohibited by said Section unless Tenant obtains the prior

consent of Landlord (or, so long as the Prior Lease is in full force and effect, of Master

Tenant):  (i) one or more sales or transfers of stock, partnership interests or LLC

membership interests, voluntarily, involuntarily, by operation of law or otherwise, or the

issuance of new stock, partnership interests or LLC membership interests, in one or a

series of transactions, by which an aggregate of 51% or more of Tenant's stock,

partnership interests or membership interests shall be vested in a party or parties who are

not stockholders, partners or members of Tenant as of the date hereof and (ii) the direct

or indirect transfer of the power to direct or cause the direction of the management and

policies of Tenant, whether through the ownership of Tenant, by contract or otherwise (it

being understood that an individual officer or director ceasing to serve in such capacity

shall not be deemed to violate this Section 8.2(a)).  So long as Tenant is a private club,

changes in the composition of the membership or directorship of such club shall not be

deemed to violate this Section 8.2(a).

      (b)  Notwithstanding any provision of Section 8.1 or Section

8.2(a), Tenant may, without Landlord's consent, assign or transfer its entire interest in

this Lease to a Successor Entity (as hereinafter defined), by operation of law or

otherwise, *provided* that the Premises will be used in a manner which will be in

compliance with Article 2 of this Lease.  A "**Successor Entity**" shall mean (i) an entity

into which or with which Tenant is merged or consolidated, in accordance with

applicable statutory provisions for the merger, reorganization, recapitalization or

consolidation of such entities, *provided* that by operation of law or by effective

provisions contained in the instruments of merger, reorganization, recapitalization or

consolidation the obligations of the Tenant under this Lease are assumed by the entity

surviving such merger, reorganization, recapitalization or consolidation, (ii) an entity

acquiring all or substantially all of the property and assets of Tenant and assuming all or

substantially all of the other liabilities of Tenant, including all obligations under this

Lease, (iii) a corporation or other entity acquiring all or substantially all of the

outstanding, issued and voting stock of Tenant (or, as applicable, all or substantially all of

the membership interests, partnership interests or other beneficial or equitable interest in

the economic benefits of the profits and losses of Tenant, if Tenant is a limited liability

company, partnership, joint venture or other business entity) or (iv) any entity successor

to a Successor Entity becoming such by any of the methods described in subdivisions (i),

(ii) and (iii) above; *provided*, in any case, that (A) such sale or transfer is for a bona fide,

legitimate business purpose and not for the primary purpose of transferring this Lease or

any interest in the Premises, (B) after such sale or transfer such Successor Entity shall

have a net worth (computed in accordance with generally accepted accounting principles)

at least equal to Tenant's net worth immediately prior to such transaction, (C) such

Successor Entity is (or will at the time of the applicable transfer will be) the fee owner of

60 Pine Street or the condominium unit owner, lessee, sublessee or licensee of both (x)

the cloak room adjoining the Cloak Room Opening and (y) the service elevator adjoining

the Service Elevator Access, (D) the Premises will be used in a manner which will be in

compliance with Article 2 of this Lease, (E) if such Successor Entity is a for-profit entity

that is not a club (a "**For-Profit Non-Club Successor Entity**"), it has not less than ten

(10) years' experience in owning or operating hotels in major metropolitan areas of at

least 'four star' quality (or has engaged a hotel operator having such experience, and (F)

not less than ten (10) Business Days' prior to such sale or transfer Tenant shall give

Landlord written notice thereof (with reasonable specificity, and certifying as to the

matters set forth in clauses (A) through (E) of this sentence).  Notwithstanding anything

in this Lease to the contrary, if any Successor Entity is a For-Profit Non-Club Successor

Entity, upon the assignment or transfer of Tenant's interest in this Lease (whether directly

or indirectly and whether by operation of law or otherwise) to such For-Profit Non-Club

Successor Entity, the annual Base Rent shall be reset as set forth in Section 8.15.

        (c)      Notwithstanding any provision of this Article 8 to the

contrary, Tenant may, without Landlord's consent, assign this Lease to any Tenant's

Affiliate or sublet all or any part of the Premises to any Tenant's Affiliate, *provided*, in

each case, that (i) the Premises will be used in a manner which will be in compliance with

Article 2 of this Lease and otherwise in compliance with Tenant's obligations under this

Lease and (ii) not less than ten (10) Business Days prior to such assignment or subletting

Tenant shall furnish Landlord with a certification of Tenant, and such other

documentation as Landlord may reasonably request, that such sublessee or assignee is a

Tenant's Affiliate.  Notwithstanding anything in this Lease to the contrary, any sublessee

or assignee shall lose its status as a Tenant's Affiliate if and when such entity shall no

longer be a corporation or other business entity which controls, is controlled by or is

under common control with the sublessor or assignor Tenant or there occurs a direct or

indirect transfer of the power to direct or cause the direction of the management and

policies of such entity, whether through the ownership of such entity, by contract or

otherwise (and Landlord's consent shall be required in connection with such losing of

such status to the same extent as Landlord's consent would have been required under the

terms of this Lease in connection with the original subleasing or assignment to a

sublessee or assignee that is not a Tenant's Affiliate).

8.3    If this Lease is assigned, whether or not in violation of the provisions of this Lease, Landlord (or, so long as the Prior Lease is in full force and effect, Master Tenant) may collect rent from the assignee.  If the Premises or any part thereof is sublet or occupied by any person other than Tenant, whether or not in violation of this Lease, Landlord (or, so long as the Prior Lease is in full force and effect, Master Tenant) may, after default by Tenant and expiration of Tenant's time to cure such default, collect rent from the subtenant or occupant.  In either event, Landlord may apply the net amount collected to Base Rent and Additional Charges herein reserved, but no such assignment, subletting, occupancy or collection shall be deemed a waiver of any of the provisions of this Article, or the acceptance of the assignee, subtenant or occupant as Tenant, or a release of Tenant from the performance by Tenant of Tenant's obligations under this Lease.  The consent by Landlord to any assignment, mortgaging, subletting or occupancy by others shall not relieve Tenant of the obligation to obtain the consent of Landlord to any other or further assignment, mortgaging, subletting or occupancy by others not expressly permitted by this Article.

8.4    Any assignment or transfer, whether or not Landlord's consent is required, shall be made only if (and shall not be effective until) the assignee executes, acknowledges and delivers to Landlord an agreement whereby the assignee assumes the obligations of Tenant under this Lease and whereby the assignee agrees that the provisions of this Article shall, notwithstanding such assignment or transfer, continue to be binding upon it in respect of all future assignments and transfers.  Notwithstanding any assignment or transfer, whether or not in violation of the provisions of this Lease, and notwithstanding the acceptance of Base Rent or Additional Charges by Landlord

from an assignee, transferee, or any other person, the original Tenant herein named and any and all successors in interest of the original Tenant herein named shall remain fully liable (jointly and severally with any immediate or remote successor in interest, including the then Tenant) for the payment of Base Rent and Additional Charges and for the other obligations of Tenant under this Lease except with respect to any increased obligations agreed to between Landlord and a successor in interest after an assignment or transfer to such successor in interest.

8.5    The liability under this Lease of the original Tenant herein named and any immediate or remote successor in interest of the original Tenant herein named shall not be discharged, released or impaired in any respect by any agreement or stipulation made by Landlord with the then Tenant extending the time of, or modifying any of the obligations under, this Lease, or by any failure of Landlord to enforce any of the obligations of Tenant under this Lease.

8.6    Neither the listing of any name other than that of Tenant, whether on the door of the Premises or elsewhere, nor the acceptance by Landlord of any check drawn by a person other than Tenant in payment of Base Rent or Additional Charges, shall operate to vest in any person any right or interest in this Lease or in the Premises, nor shall same be deemed to be the consent of Landlord to any assignment or transfer of this Lease or to any sublease of the Premises or to the occupancy thereof by any person other than Tenant.

8.7    If Tenant is not in default of any of its obligations under this Lease beyond the applicable period after notice (if any) and grace provided for herein, Landlord's consent (which shall be in form reasonably satisfactory to Landlord) to the

proposed assignment or sublease shall not be unreasonably withheld (so long as Tenant shall not be in monetary or material non-monetary default under this Lease, beyond applicable notice, grace and cure periods, at such time). The reasonableness of such consent shall take into account (inter alia) the following:

       (a)    Tenant has complied with the provisions of this Article 8;

       (b)    the proposed assignee or subtenant has not less than ten (10) years' experience in owning or operating hotels in major metropolitan areas of at least "four star" quality (or has engaged a hotel operator having such experience);

       (c)    the Premises will be used in a manner which (i) is in keeping with the then standards of the Building (as determined in Landlord's reasonable judgment) and (ii) will be in compliance with Article 2 of this Lease;

       (d)    in Landlord's commercially reasonable judgment the proposed assignee or subtenant has sufficient financial resources in light of the obligations such person or entity will have under this Lease or the sublease (as the case may be); and

       (e)    the proposed assignee is (or will at the time of the assignment will be) the fee owner of 60 Pine Street or the condominium unit owner, lessee, sublessee or licensee of both (i) the cloak room adjoining the Cloak Room Opening and (ii) the service elevator adjoining the Service Elevator Access.

       8.8    Tenant shall reimburse Landlord within ten (10) Business Days after demand for any actual, reasonable out-of-pocket costs incurred by Landlord in connection with any request for consent to any proposed assignment or sublease, whether or not consented to by Landlord, including the cost of making investigations as to the

acceptability of the proposed assignee or subtenant, and reasonable attorneys' fees and disbursements in connection with the granting of any requested consent.

8.9    With respect to any subletting to any other subtenant and/or acceptance of rent or additional rent by Landlord from any other subtenant, (a) Tenant shall remain fully liable for the payment of Base Rent and Additional Charges due and to become due hereunder and for all of the other obligations of Tenant under this Lease and (b) Tenant shall remain fully liable for all acts and omissions of any licensee or subtenant or any person claiming through or under any licensee or subtenant that are in violation of any of the obligations of Tenant under this Lease. Notwithstanding any such subletting, no other or further subletting of the Premises by Tenant or any person claiming through or under Tenant shall be made except in compliance with and subject to the provisions of this Article 8. If Landlord declines to give its consent to any proposed assignment or sublease, Tenant shall indemnify Landlord against liability in connection with any claims made against Landlord by the proposed assignee or subtenant or by any brokers or other persons with whom Tenant (or the proposed assignee or subtenant) has dealt claiming a commission or similar compensation in connection with the proposed assignment or sublease.

8.10    If (a) Landlord consents to a proposed assignment or sublease and (b) Tenant fails to execute and deliver the assignment or sublease to which Landlord consented within one hundred twenty (120) days after the giving of such consent, then Tenant shall again be required to comply with the provisions of this Article 8 (as if Tenant had not requested such consent) before assigning this Lease or subletting all or any part of the Premises.

8.11    In respect of every permitted sublease (whether or not Landlord's consent thereto is required):

(a)    no sublease shall be for a term ending later than the day before the Expiration Date;

(b)    no sublease shall be valid, and no subtenant shall take possession of the Premises or any part thereof, until an executed counterpart of such sublease has been delivered to Landlord;

(c)    each sublease shall provide that it is subject and subordinate to this Lease and to the matters to which this Lease is or shall be subordinate, and that in the event of termination, reentry or dispossess by Landlord under this Lease, Landlord may, at its option, take over all of the right, title and interest of Tenant, as sublessor, under such sublease, and such subtenant shall, at Landlord's option, attorn to Landlord pursuant to the then executory provisions of such sublease and execute and deliver such instruments as Landlord may reasonably request to evidence and confirm such attornment, except that Landlord shall not be (i) liable for any previous act or omission of Tenant under such sublease, (ii) subject to any offset which had accrued to such subtenant against Tenant, (iii) bound by any previous modification of such sublease not consented to by Landlord or by any prepayment of more than one month's rent or additional rent, (iv) obligated to make any payment to or on behalf of such subtenant or to perform any repairs or other work in the subleased space or the Building beyond Landlord's obligations under this Lease, or (v) required to account for any security deposit other than any actually delivered to Landlord; and

(d)    the rental and other material terms and conditions of each

sublease shall be substantially the same as those contained in the term sheet furnished to

Landlord pursuant to Section 8.7 (if applicable).

8.12    If Landlord gives its consent to any assignment of this Lease or to

any sublease, in each case, which requires Landlord's consent under the terms of this

Lease or Tenant's interest in this Lease is assigned or transferred (whether directly or

indirectly and whether by operation of law or otherwise) to a For-Profit Non-Club

Successor Entity, then (notwithstanding the provisions of Exhibit D), upon the effective

date of the assignment, subletting or transfer, as applicable, the annual Base Rent shall be

reset to (if higher than the Base Rent that would otherwise be payable) the Fair Market

Rent of the Premises computed as of the date that is six (6) months prior to such date

(determined pursuant to Paragraphs 4 and 5 of Exhibit D, with the Rental Notice being

given to Tenant by Landlord within thirty (30) days after Landlord's consent or Tenant's

notice to Landlord, as applicable, and otherwise mutatis mutandis, *provided* that, if the

"Fair Market Rent of the Premises" (as defined in the Prior Lease) shall have been

determined pursuant to Section 8.12 of the Prior Lease in connection with such

assignment, subletting or transfer, as applicable, prior to the occurrence of the Master

Lease End Date, the Fair Market Rent of the Premises for the purposes of this Lease for

such assignment, subletting or transfer, as applicable, shall be the "Fair Market Rent of

the Premises" (as defined in the Prior Lease) as so determined pursuant to the Prior

Lease).  Until such time as such Fair Market Rent of the Premises is finally determined,

Tenant shall pay Base Rent at the otherwise-payable rate (and Tenant shall pay any

underpayment to Landlord within thirty (30) days after such Fair Market Rent of the

Premises has been finally determined).  Such reset Base Rent rate shall remain in place

until the rate of Base Rent is next reset under Exhibit D (or under this Section 8.12).

8.13    If Tenant at any time requests Landlord to sublet the Premises for

Tenant's account, Landlord is authorized to receive keys for such purpose without

releasing Tenant from any of its obligations under this Lease, and Tenant hereby releases

Landlord of and from any liability for loss or damage to any Tenant's Property in

connection with such subletting, provided Landlord exercises reasonable care to prevent

damage to Tenant's Property.

8.14    Notwithstanding any other provision of this Lease, the

transfer of any stock, partnership or other ownership interests of Tenant (other than the

transfer of control of Tenant by one entity which controls Tenant or by several entities

which are Tenant's Affiliates or are acting under an agreement and collectively control

Tenant) shall not constitute an assignment of this Lease for purposes of Section 8.12 if

such stock, partnership or other ownership interests are listed on a national securities

exchange (as defined in the Securities Exchange Act of 1934, as amended) or is traded in

the "over the counter" market with quotations reported by the National Association of

Securities Dealers; and further *provided* that any conversion of the form of entity of

Tenant (however accomplished including, by way of example (i) the conversion of

Tenant from a not-for-profit corporation to a limited liability company, partnership or

trust or (ii) the change of jurisdiction of incorporation or registration) which does not

directly or indirectly transfer control of Tenant (including, without limitation, the power

to direct or cause the direction of the management and policies of Tenant, whether

through the ownership of Tenant, by contract or otherwise), reduce the tangible net worth

of Tenant or reduce its liability for its obligations under this Lease shall not constitute an assignment of this Lease for purposes of Section 8.12, *provided* that the converted entity assumes by written instrument all of Tenant's obligations under this Lease and such conversion is for a valid business purpose and not to avoid any obligations under this Lease.

8.15    No assignment or other transfer of this Lease and the term and estate hereby granted, and no subletting of all or any portion of the Premises (in each case whether or not Landlord's consent is required thereto), shall relieve Tenant of its liability under this Lease or of the obligation to obtain Landlord's prior consent to any future assignment, transfer or subletting.

8.16    Notwithstanding anything in this Lease to the contrary, Landlord shall have an unrestricted right to assign this Lease and its rights and obligations under this Lease.  In the event of any transfer or transfers of title by Landlord of the fee interest in the Premises from and after the Prior Lease Commencement Date, or the assignment or other transfer of the Lease by Landlord to the holder of the fee interest in the Premises from and after the Prior Lease Commencement Date, as applicable, and delivery of the Security Deposit (if then held by Landlord) to such transferee (and notice to Tenant thereof), the transferor shall be relieved and freed of all obligations of Landlord under this Lease accruing after such transfer, and such transferee shall be automatically and conclusively deemed to have assumed and agreed to perform and observe all obligations of Landlord under this Lease during the period it is the holder of Landlord's interest under this Lease, subject, however, to the provisions of Article 19 and any other provisions of this Lease.  Notwithstanding anything in this Lease to the contrary,

Landlord named herein shall be liable for all obligations of Landlord accruing on or before the Prior Lease Commencement Date.

## ARTICLE 9

### COMPLIANCE WITH LEGAL
### AND INSURANCE REQUIREMENTS

9.1     Tenant shall give prompt notice to Landlord of any notice it receives of the violation of any Legal Requirements or Insurance Requirements in respect of the Premises or the use or occupancy thereof.  Tenant shall, at Tenant's expense, comply with all Legal Requirements and Insurance Requirements relating to the Premises or the use or occupancy thereof, except that Tenant shall not be required to comply with any Legal Requirement or Insurance Requirement to the extent the same requires structural alteration of the Premises or affects the Building systems (including the heat pumps and the Private Elevator) or items behind the walls, in each case, unless the necessity therefor results from (a) Alterations, (b) Tenant's or any occupant's particular manner of use of the Premises (as compared with mere use for the uses permitted under Article 2 above) or of the operation of Tenant's or such occupant's installations, equipment or other property therein, (c) any negligence or willful misconduct by Tenant or any occupant (or any party claiming by, through, or under Tenant or any occupant) or (d) the breach of any of Tenant's obligations under this Lease.  Tenant shall pay all the costs, expenses, fines, penalties and damages imposed upon Landlord or any Superior Lessors or Superior Mortgagees by reason of or arising out of Tenant's failure to fully and promptly comply with and observe the provisions of this Section 9.1.  However, Tenant need not comply with any Legal Requirement so long as Tenant is contesting the

validity thereof or the applicability thereof to the Premises in accordance with Section 9.2. Landlord shall comply with all other Legal Requirements and Insurance Requirements affecting the Premises but may similarly defer compliance so long as Landlord is contesting the validity or applicability thereof.

9.2     Tenant, at its expense, after notice to Landlord, may contest by appropriate proceedings prosecuted diligently and in good faith the validity or applicability to the Premises of any Legal Requirements applicable to Tenant *provided* that (a) neither Landlord nor any Superior Lessor or Superior Mortgagee is subject to criminal penalty or to prosecution for a crime, and neither the Building nor any part thereof is subject to being condemned or vacated, by reason of noncompliance or otherwise by reason of such contest, (b) before the commencement of such contest, Tenant furnishes to Landlord (or, so long as the Prior Lease is in full force and effect, to Master Tenant) either (i) a completion bond of a corporate surety licensed to do business in the State of New York and reasonably satisfactory to Landlord (or, so long as the Prior Lease is in full force and effect, to Master Tenant), which bond shall be, as to its provisions and form, reasonably satisfactory to Landlord (or, so long as the Prior Lease is in full force and effect, to Master Tenant), in an amount at least equal to 125% of the cost of such compliance (as estimated by a reputable and experienced contractor selected by Tenant and reasonably satisfactory to Landlord (or, so long as the Prior Lease is in full force and effect, to Master Tenant)), or (ii) other security in place of such bond reasonably satisfactory to Landlord (or, so long as the Prior Lease is in full force and effect, to Master Tenant), and (c) such noncompliance or contest does not constitute or result in any violation of any Superior Lease or Superior Mortgage (or if any Superior

Lease and/or Superior Mortgage permits such noncompliance or contest only if Landlord takes some specified action or furnishes security, such action is taken and/or such security is furnished at the expense of Tenant). Tenant shall keep Landlord advised as to the status of such proceedings and Tenant shall indemnify and hold harmless Landlord against liability in connection with such contest or noncompliance. Without limiting the application of the above, Landlord, any Superior Lessor and any Superior Mortgagee shall be deemed subject to prosecution for a crime if Landlord or any Superior Lessor or Superior Mortgagee, or any managing agent for the Building, or any officer, director, partner, shareholder or employee of Landlord or of any managing agent for the Building or of any Superior Lessor or Superior Mortgagee, is charged with a crime of any kind or degree, whether by service of a summons or otherwise.

9.3    Notwithstanding any provision of this Article 9, in the event that by reason of any Legal Requirement a vacate or evacuation order (or the functional equivalent thereof) is given, Tenant shall cause the Premises to be vacated or evacuated as and when so required.

## ARTICLE 10

## INSURANCE

10.1    Tenant shall not violate or permit the violation of any Insurance Requirements and shall not do, or permit anything to be done, or keep or permit anything to be kept in the Premises which would subject Landlord or any Superior Lessor or Superior Mortgagee to liability or responsibility for bodily injury or death or property damage, or which would increase any insurance rate in respect of insurance maintained

by Landlord over the rate which would otherwise then be in effect, or which would result in an insurance company refusing to insure all or any part of the Property or any contents thereof in amounts reasonably satisfactory to Landlord, or which would result in the cancellation of or the assertion of any defense by the insurer in whole or in part to claims under any policy of insurance maintained by Landlord.

10.2    If, by reason of (a) any failure of Tenant to comply with the provisions of <u>Section 9.1</u> or <u>Section 10.1</u> or (b) any cause or condition created by or at the instance of Tenant (but, for the avoidance of doubt, excluding Landlord's Work, including the Cloak Room Opening and the Service Elevator Access), including, without limitation, the making of or failure to make any Alterations or repairs, the premiums on any insurance maintained by Landlord shall be higher than they otherwise would be, Landlord shall give Tenant notice of such occurrence, and Tenant shall reimburse Landlord on demand for that part of such premiums attributable to such failure on the part of Tenant.  A schedule or "make up" of rates for any insurance maintained by Landlord issued by the New York Fire Insurance Rating Organization or other similar body making rates shall be prima facie evidence of the facts therein stated and of the several items and charges in the insurance rate then applicable to such insurance.

10.3    Tenant, at its sole cost and expense, shall maintain (A) commercial general liability insurance coverage on an occurrence basis against claims for personal injury, bodily injury, death and/or property damage and including contractual liability coverage, in respect of the Premises and the conduct or operation of business therein, with Landlord, Antique Pine Rose, LLC, Rose Associates Inc. and their successors and assigns, any condominium board for the Building, and any managing agent, Superior

Lessors and Superior Mortgagees whose names and addresses were furnished to Tenant

and, so long as the Master Lease is in full force and effect, Master Tenant, as additional

insureds, with limits of not less than the following (i) $1,000,000 per occurrence, (ii)

$2,000,000 general aggregate, (iii) $1,000,000 for personal and advertising injury

liability, (iii) $5,000 for medical payments, (iv) $1,000,000 for fire damage, (v)

$1,000,000 for employee benefits, (vi) $1,000,000 for hired and non-owned auto and (vii)

$2,000,000 for liquor liability, and (B) umbrella liability insurance coverage with a limit

of not less than $15,000,000.  The limits of such insurance shall not limit the liability of

Tenant hereunder.  Tenant shall deliver to Landlord (or, so long as the Master Lease is in

full force and effect, to Master Tenant, with copies delivered to Landlord) certificates for

such insurance in form reasonably satisfactory to Landlord (or, so long as the Prior Lease

is in full force and effect, to Master Tenant) issued by the insurance company or its

authorized agent no later than the Prior Lease Commencement Date.  All such policies

shall be noncancellable in respect of Landlord and any additional insureds unless thirty

(30) days' prior written notice is given to Landlord and all additional insureds and all

such policies shall provide that no act or omission of Tenant shall affect or limit the

obligations of the insurer in respect of Landlord and the additional insureds.  Tenant shall

procure and pay for renewals of such insurance from time to time before the expiration

thereof.  Tenant shall deliver to Landlord (or, so long as the Master Lease is in full force

and effect, to Master Tenant, with copies delivered to Landlord) certificates for renewal

policies issued by the insurance company or its authorized agent no later than the

expiration of any existing policy.  All such policies shall be issued by licensed insurance

companies, reasonably satisfactory to Landlord (or, so long as the Prior Lease is in full

force and effect, to Master Tenant) and with an A.M. Best's (or its successor) rating of

A/VIII or better or the then equivalent of such rating. Tenant is hereby advised that as of

the date hereof the Superior Lessor and the Superior Mortgagee are as provided in

Section 6.2.

       10.4    Tenant shall maintain in full force and effect a policy of all risk

property insurance covering the Tenant's furniture, fixtures, improvements, betterments

and personal property in an amount not less than 100% of the total replacement cost of all

such property of Tenant. All such policies shall be issued by a licensed insurance

company with an A.M. Best's rating of A/VIII or better or the then equivalent of such

rating. A certificate of insurance evidencing coverage shall be issued to Landlord (or, so

long as the Prior Lease is in full force and effect, to Master Tenant, with copies delivered

to Landlord) prior to the Prior Lease Commencement Date and Tenant shall deliver to

Landlord (or, so long as the Master Lease is in full force and effect, to Master Tenant,

with copies delivered to Landlord) certificates of insurance not later than ten (10)

Business Days after the expiration of said policies.

       10.5    Each party shall have included in each of its all risk property

policies (insuring the Building and Landlord's property therein in the case of Landlord,

and insuring Tenant's Property in the case of Tenant) a waiver of the insurer's right of

subrogation against the other party or, if such waiver is unobtainable or unenforceable,

(a) an express agreement that such policy shall not be invalidated if the insured waives

the right of recovery against any party responsible for a loss covered by the policy before

the loss, or (b) any other form of permission for the release of the other party. If such

waiver, agreement or permission is not, or ceases to be, obtainable from either party's

then current insurance company, the insured party shall so notify the other party promptly

after learning thereof, and shall use commercially reasonable efforts to obtain same from

another insurance company, without thereby incurring any liability or expense not

expressly provided for in this Lease.  If such waiver, agreement or permission is

obtainable only by payment of an additional charge, the insured party shall so notify the

other party promptly after learning thereof, and the insured party shall not be required to

obtain said waiver, agreement or permission unless the other party pays the additional

charge therefor.  Each party hereby releases the other in respect of any claim (including a

claim for negligence) which it might otherwise have against the other for loss, damage or

destruction of or to its property to the extent to which it is insured under a policy

containing a waiver of subrogation or express agreement that such policy shall not be

invalidated or permission to release liability, as provided above in this Section 10.5.  If

notwithstanding the recovery of insurance proceeds by either party for loss, damage or

destruction of or to its property, the other party is liable to the first party in respect

thereof or is obligated under this Lease to make replacement, repair, restoration or

payment, then, *provided* that the first party's right of full recovery under its insurance

policy is not thereby prejudiced or otherwise adversely affected, the amount of the net

proceeds of the first party's insurance against such loss, damage or destruction shall be

offset against the second party's liability to the first party therefor, or shall be made

available to the second party to pay for replacement, repair or restoration, as the case may

be.  Nothing contained in this Section 10.5 shall be deemed to (i) relieve either party of

any duty imposed elsewhere in this Lease to repair, restore or rebuild or (ii) nullify any

abatement or reduction of rents provided for elsewhere in this Lease.

10.6    All dollar amounts in this Article 10 shall be Adjusted for Inflation (but if Tenant demonstrates, to Landlord's (or, so long as the Prior Lease is in full force and effect, to Master Tenant's) reasonable satisfaction, that any such Adjustment for Inflation results in an insurance amount that is in excess of the amount then customarily required by owners of buildings in Manhattan containing hotel rooms, then such customarily-required amount shall apply).  Landlord may from time to time, but not more frequently than once every year, require that the amount of commercial general liability insurance, and/or the types of insurance, to be maintained by Tenant under Article 10 be reasonably increased to an amount not in excess of the amount then customarily required by owners of buildings in Manhattan containing hotel rooms, *provided* that, so long as the Prior Lease is in full force and effect, the insurance coverage meeting the requirements of the Prior Lease shall be deemed to satisfy the requirements of this Lease.

10.7    Tenant shall maintain in full force and effect a policy of Worker's Compensation Insurance in compliance with all statutory requirements.

10.8    Tenant shall maintain in full force and effect business income insurance for at least twelve (12) months containing an extended period of indemnity endorsement which provides that after physical loss to the Premises and personal property has been incurred, the continued loss of income will be insured until the expiration of twelve (12) months after all physical loss to the Premises and personal property has been fully repaired and restored and such income returns to the same level it was at prior to the loss.

10.9    The insurance required to be carried by Tenant pursuant to the provisions of this Article 10 may be effected by blanket and/or umbrella policies issued

to Tenant covering the Premises and other properties owned or leased by Tenant or any

Tenant's Affiliate, *provided* that such policies otherwise comply with the provisions of

this Lease and allocate to the Premises the specified coverage, including, without

limitation, the specified coverage for all insureds required to be named as insureds

hereunder, without possibility of reduction or coinsurance by reason of, or because of

damage to, any other properties named therein.

**ARTICLE 11**

**RULES AND REGULATIONS**

11.1    Tenant shall observe and comply (and shall cause any occupants,

subtenants and licensees, and its and their respective members, directors, officers,

partners, employees, agents, contractors, guests and invitees, to observe and comply) with

each of the rules and regulations that Landlord (or, so long as the Master Lease is in full

force and effect, Master Tenant) at any time (and from time to time) makes and of which

Landlord (or, so long as the Master Lease is in full force and effect, Master Tenant)

notifies Tenant, and which in Landlord's (or, so long as the Master Lease is in full force

and effect, Master Tenant's) reasonable judgment are necessary or desirable for the

reputation, safety, care or appearance of the Building, or the preservation of good order

therein, or the operation or maintenance of the Building (taking into account, inter alia,

the use of the Premises and that access to the Premises is via 60 Pine Street and not the

lobby of the Building).  Such rules and regulations, as changed from time to time, are

herein called the "**Rules and Regulations**."  In case of any conflict or inconsistency

between the provisions of this Lease and any of the Rules and Regulations, the provisions

of this Lease shall control.  References in the Rules and Regulations to "tenant" shall be

deemed to apply (as the context requires) to Tenant and any occupants, subtenants, licensees, members, guests or other parties claiming by, through or under Tenant.

11.2    Except to the extent (if any) as may be otherwise required by reason of unique circumstances, the Rules and Regulations shall be uniformly applied and enforced against the tenants of the Building, in a non-discriminatory manner.

# ARTICLE 12

# ALTERATIONS

12.1    Tenant may from time to time, at its expense, make such alterations ("**Alterations**"; for the avoidance of doubt, the term "Alterations" shall not be deemed to include Landlord's Work) to the Premises as Tenant reasonably considers necessary for the use of the Premises in accordance with Article 2, *provided* and upon condition that: (a) the Alterations are non-structural and the structural integrity of the Building is not affected, (b) the Alterations are to the interior of the Premises, no part of the Building outside of the Premises (including without limitation, the façade of the Building) is affected, and the outside appearance of the Building is not affected, (c) the proper functioning of the mechanical, electrical, sanitary, elevator and other service systems of the Building is not adversely affected, and (d) no change in the certificate of occupancy for any portion of the Building will result from the Alterations or be required as a result thereof. From and after the Master Lease End Date, before proceeding with any Alteration (other than painting and other strictly decorative work), Tenant shall give Landlord notice thereof (with reasonable detail) and submit to Landlord for Landlord's approval (which shall not be unreasonably withheld or delayed) scaled and dimensioned

plans and specifications for the work to be done prepared by a registered architect or

licensed professional engineer, and Tenant shall not proceed with such work until it

obtains such approval.  Tenant shall pay to Landlord on demand the actual, reasonable

out-of-pocket costs and expenses of any outside consultants hired by Landlord for the

purpose of (i) reviewing said plans and specifications and (ii) inspecting the Alterations

to determine whether the same are being performed in accordance with the approved

plans and specifications and all Legal Requirements and Insurance Requirements

including the fees or cost of any architect, engineer or draftsman for such purposes.

Before proceeding with any Alteration (other than (A) Tenant's initial Alterations in

preparation for its move-in to the Premises and (B) any Alteration with a total project

cost that will not exceed One Hundred Thousand and 00/100 Dollars ($100,000.00) (as

Adjusted for Inflation) (exclusive of the cost of purely decorative work and items

constituting Tenant's Property), as estimated, at Tenant's expense, by a reputable and

experienced contractor reasonably satisfactory to Landlord), Tenant shall obtain and

deliver to Landlord (or, so long as the Master Lease is in full force and effect, to Master

Tenant) either, at Tenant's option, (x) a performance bond and a labor and materials

payment bond reasonably satisfactory to Landlord (or, so long as the Master Lease is in

full force and effect, to Master Tenant) issued by a corporate surety licensed to do

business in the State of New York and reasonably satisfactory to Landlord (or, so long as

the Master Lease is in full force and effect, to Master Tenant), each in an amount equal to

125% of such estimated cost and in form reasonably satisfactory to Landlord (or, so long

as the Master Lease is in full force and effect, to Master Tenant), or (y) such other

equivalent security as shall be reasonably satisfactory to Landlord (or, so long as the

Master Lease is in full force and effect, Master Tenant).  Tenant shall fully and promptly

comply with and observe the Rules and Regulations then in force in respect of making

Alterations.  Any review or approval by Landlord of any plans or specifications in respect

of any Alterations is solely for Landlord's benefit and without any representation or

warranty to Tenant as to the adequacy, correctness or efficiency thereof or as to the

compliance of such plans and specifications with Legal Requirements or Insurance

Requirements.

        12.2    Tenant, at its expense, shall obtain all necessary governmental

permits and certificates for the commencement and prosecution of Alterations and for

final approval thereof upon completion, and shall cause Alterations to be performed in

compliance therewith and with all applicable Legal Requirements and Insurance

Requirements.  Landlord shall cooperate as reasonably requested by Tenant in obtaining

all such permits, certificates and approvals, and Tenant shall pay any actual, reasonable

out-of-pocket third-party costs and expenses incurred by Landlord in connection

therewith.  Alterations shall be diligently performed in a good and workerlike manner,

using new and high quality materials and equipment.  Alterations shall be performed by

contractors, construction managers, subcontractors, architects and/or engineers first

approved by Landlord (or, so long as the Master Lease is in full force and effect, by

Master Tenant), such approval not to be unreasonably withheld.  Alterations shall be

performed in such a manner as not to violate any union contracts affecting the Property,

or to create any work stoppage, picketing, labor disruption or dispute or any interference

with the business of Landlord or any tenant of the Building.  In addition, Alterations shall

be performed in such a manner as not to otherwise unreasonably interfere with or delay

and as not to impose any additional expense upon Landlord in the construction, maintenance, repair, operation or cleaning of the Building, and if any such additional expense is incurred by Landlord as a result of Tenant's performance of Alterations, Tenant shall pay such additional expense to Landlord within thirty (30) days after invoice (given together with reasonable back-up documentation).  Throughout the performance of any Alterations, Tenant shall carry, or cause its contractors to carry, workers' compensation insurance in statutory limits, "Builder's Risk" insurance reasonably satisfactory to Landlord (or, so long as the Master Lease is in full force and effect, to Master Tenant), and comprehensive general liability insurance, with completed operations endorsement, for any occurrence in or about the Building, under which Landlord, Antique Pine Rose, LLC, Rose Associates Inc. and their successors and assigns, any condominium board for the Building, and any managing agent, Superior Lessors and Superior Mortgagees whose names and addresses were furnished to Tenant, and, so long as the Master Lease is in full force and effect, Master Tenant, as additional insureds, in such limits as Landlord (or, so long as the Master Lease is in full force and effect, Master Tenant) may reasonably require, with insurers reasonably satisfactory to Landlord (or, so long as the Master Lease is in full force and effect, to Master Tenant). Tenant shall furnish Landlord (or, so long as the Master Lease is in full force and effect, Master Tenant) with reasonably satisfactory evidence that such insurance is in effect before the commencement of Alterations and, on request, at reasonable intervals during the continuance of Alterations.  If any Alterations involve the removal of any fixtures, equipment or other property in the Premises which are not Tenant's Property, such fixtures, equipment or other property shall be promptly replaced at Tenant's expense with

new fixtures, equipment or other property of like utility and at least equal value. Upon completion of any Alterations (other than mere decorations) Tenant shall deliver to Landlord (or, so long as the Master Lease is in full force and effect, to Master Tenant) scaled and dimensioned reproducible mylars of "as-built" plans for such Alteration (and/or record drawings) and a copy on a diskette format (or such other format as Landlord (or, so long as the Master Lease is in full force and effect, Master Tenant) may reasonably require), and copies of any required Department of Buildings signoff.

12.3    Tenant, at its expense, shall promptly procure the cancellation or discharge of all notices of violation arising from or otherwise connected with Alterations, or any other work, labor, services or materials done for or supplied to Tenant (other than Landlord's Work) or any person claiming through or under Tenant which are issued by the Department of Buildings of the City of New York or any other public authority having or asserting jurisdiction. Tenant shall indemnify and hold harmless Landlord against liability in connection with any and all mechanics' and other liens and encumbrances filed in connection with Alterations, or any other work, labor, services or materials done for or supplied to Tenant (other than Landlord's Work) or any person claiming through or under Tenant, including security interests in any materials, fixtures or articles so installed in the Premises. Tenant, at its expense, shall procure the satisfaction or discharge of record of all such liens and encumbrances (by bonding or otherwise) within forty-five (45) days after the Tenant receives notice of the filing thereof.

12.4    Tenant is hereby notified that the Building (and, accordingly, the Premises) is subject to the jurisdiction of the Landmarks Preservation Commission and

the New York State Historic Preservation Office.  In accordance with sections 25-305,

25-306, 25-309 and 25-310 of the Administrative Code of the City of New York and the

rules set forth in Title 63 of the Rules of the City of New York, any demolition,

construction, reconstruction, alteration or minor work as described in such sections and

such rules may not be commenced within or at the Premises without the prior written

approval of the Landmarks Preservation Commission.  Tenant is notified that such

demolition, construction, reconstruction, alteration or minor work includes, but is not

limited to,  interior work to the Premises that (i) requires a permit from the Department of

Buildings or (ii) changes, destroys or affects an interior architectural feature of an interior

landmark or an exterior architectural feature of an improvement that is a landmark or

located on a landmark site or a historic district.  In connection with the foregoing,

Alterations may require a "certificate of no effect" (and any such certificate shall be

Tenant's responsibility to obtain, at Tenant's sole cost and expense, but Landlord shall

cooperate with Tenant (at no unreimbursed cost to Landlord) in connection therewith).

## ARTICLE 13

### LANDLORD'S AND TENANT'S PROPERTY;
### REMOVAL AT END OF TERM

13.1    All fixtures, equipment, improvements and appurtenances,

including utility lines and equipment, attached to or built into the Premises before or after

the date of this Lease, whether by or at the expense of Landlord, Master Tenant or

Tenant, shall be and remain a part of the Premises, shall be deemed the property of

Landlord and shall not be removed by Tenant except as provided in Section 13.2.

13.2    All movable partitions, fixtures, machinery and equipment not attached to or built into the Premises, which are, or were, installed in the Premises by Tenant (or Tenant's predecessor in interest as tenant under this Lease) without expense to Landlord or Master Tenant and which can be removed without structural damage to the Building, and all furniture, furnishings and other articles of movable personal property owned by Tenant, or any predecessor in interest thereto, occupant, subtenant or licensee, and located in the Premises (collectively, "**Tenant's Property**") shall be and shall remain the property of such owner and may be removed by Tenant or such owner at any time during the Term, *provided* that if any Tenant's Property is installed or removed, Tenant shall repair or pay the cost of repairing any damage to the Premises or to the Building resulting from the installation and/or removal thereof, other than repainting and purely decorative repairs.  At or before the Expiration Date, or within fifteen (15) days after an earlier termination date, Tenant, at its expense, shall remove (or cause to be removed) from the Premises all Tenant's Property, and Tenant shall repair any damage to the Premises and the Building resulting from any installation and/or removal of Tenant's Property.  Any other items of Tenant's Property which remain in the Premises after the Expiration Date, or after fifteen (15) days following an earlier termination, may, at the option of Landlord, be deemed to have been abandoned, and in such case such items may be retained by Landlord as its property or disposed of by Landlord without accountability in such manner as Landlord shall determine at Tenant's expense.

13.3    If Landlord notifies Tenant at the time of Landlord's approving the plans and specification for any Alterations that any identified portion of such Alterations that do not constitute standard hotel installations are to be removed upon the expiration or

sooner termination of this Lease (or if Master Tenant has so notified Tenant during the term of the Prior Lease pursuant to Section 13.3 of the Prior Lease), then Tenant shall remove such identified non-standard Alterations not later than such Expiration Date or, in the case of any sooner termination, with reasonable promptness (using diligent efforts) thereafter. The cost and expense of any such removal (including removal by Landlord upon Tenant's failure to do so as provided herein), and the cost of repairing any damage to the Premises or the Building arising from such removal, shall be paid by the Tenant within ten (10) Business Days after invoice (with reasonable backup documentation). Such removal obligation shall survive the expiration or termination of this Lease.

## ARTICLE 14

## REPAIRS AND MAINTENANCE

14.1    Tenant shall, at its expense, maintain, repair, replace (to the extent reasonably necessary) and otherwise take good care of the Premises, any Tenant's Property and the furniture, equipment, fixtures and appurtenances in the Premises to the extent the same is not structural, is not part of the Building systems including heat pumps and the Private Elevator, and is not behind the walls, in each case, unless the need for such maintenance, repair or replacement, as applicable, arises out of any Tenant Repair Criteria (in which case such maintenance, repair or replacement, as applicable, shall be Tenant's responsibility). In addition, Tenant shall be responsible for and shall promptly make all repairs (and, to the extent reasonably necessary, replacements), interior and exterior, structural and nonstructural, ordinary and extraordinary, in and to the Premises and the Building the need for which arises out of any of the following (collectively, the **"Tenant Repair Criteria"**): (a) Alterations or other work by or on behalf of Tenant (but

not including Landlord's Work), (b) the installation, use or operation of Tenant's Property, (c) the moving of Tenant's Property in or out of the Premises or the Building, or (d) the improper act, improper omission, misuse or neglect of or by Tenant or any subtenant or licensee or occupant, or their respective members, employees, agents, contractors, guests or invitees.  Tenant, at its expense, shall promptly repair or replace all broken doors and glass in the Premises and shall, subject to the terms of this Lease, be responsible for all repairs, painting, maintenance and replacement of wall and floor coverings in the Premises and for the repair and maintenance (and, to the extent reasonably necessary, replacement) of all fixtures and equipment in the Premises (whether or not supplied by Landlord), *provided* that Landlord (or, so long as the Prior Lease is in full force and effect, Master Tenant) shall be responsible for all items behind the walls, all structural elements and all Building systems (including the heat pumps and the Private Elevator), in each case, except to the extent the repair, maintenance or replacement is necessitated by any of the Tenant Repair Criteria (in which case, such repair, maintenance or replacement, as applicable, shall be Tenant's responsibility).  Any repairs required to be made by Tenant to any Building systems shall be performed only by contractors approved by Landlord (or, so long as the Master Lease is in full force and effect, by Master Tenant), which approval shall not be unreasonably withheld.  Any structural repairs or repairs to the Building systems for which Tenant is responsible under the terms of this Lease, may, at Landlord's (or, so long as the Master Lease is in full force and effect, Master Tenant's) option, be performed by Landlord (or, so long as the Master Lease is in full force and effect, by Master Tenant) at Tenant's expense, and Landlord (or, so long as the Master Lease is in full force and effect, Master Tenant) may,

at its option, before Tenant commences any such work or at any time thereafter, require

Tenant to furnish to Landlord (or, so long as the Master Lease is in full force and effect,

to Master Tenant) bonds under the same terms and conditions as would apply if such

repair were an Alteration.

14.2    At no additional charge to Tenant, Landlord (or, so long as the

Prior Lease is in full force and effect, Master Tenant) shall make or cause to be made all

repairs, structural and otherwise, interior and exterior, as and when needed in or to the

Building and the systems servicing the Building and the Premises except for those repairs

for which Tenant is responsible pursuant to <u>Section 14.1</u>.

14.3    If, for any reason other than a casualty, condemnation or default by

Tenant of its obligations to be observed or performed under this Lease, Landlord fails to

furnish any of the services which Landlord is required to furnish pursuant to the terms of

this Lease, and as a result of any of the foregoing, all or a material portion of the

Premises shall be rendered untenantable or inaccessible and Tenant shall vacate the

Premises as a result thereof (an "**Untenantability Condition**"), and such Untenantability

Condition shall continue for five (5) consecutive Business Days after notice from Tenant

to Landlord (or, in the case of an Untenantability Condition caused by Force Majeure

Events, such Untenantability Condition shall continue for a period of fifteen (15)

consecutive days after notice from Tenant to Landlord), then Base Rent and electricity

charges shall abate solely with respect to the portion or portions of the Premises subject

to such Untenantability Condition from the day after such five (5) consecutive Business

Days (or fifeen (15) consecutive days in case of Force Majeure Events) until such space

is no longer subject to such Untenantability Condition and Landlord (or, so long as the

Prior Lease is in full force and effect, Master Tenant) gives Tenant notice thereof.

14.4   Except as otherwise expressly provided in this Lease, Landlord

shall have no liability to Tenant, nor shall Tenant's obligations under this Lease be

reduced or abated in any manner, by reason of any inconvenience, annoyance,

interruption or injury to Tenant's business arising from Landlord's making any repairs or

changes which Landlord is required or permitted to make.

14.5   Tenant shall at all times provide a fire safety director for the

Premises, at Tenant's sole cost and expense.

## ARTICLE 15

## ELECTRIC ENERGY

15.1   (a)     Subject to the terms of the Lease (including, without

limitation, Section 15.2(a)), from and after the Commencement Date, Landlord shall

furnish to the Premises sufficient electrical energy in the Premises for Tenant's

reasonable use of the Premises in accordance with Article 2 of this Lease, through the

feeders, wiring installations and facilities heretofore installed in the Building and, to the

extent not previously installed, shall install at Landlord's cost and expense at least one

(1) submeter in the Premises to measure the consumption of electrical energy therein.

Tenant shall pay to Landlord, as Additional Charges hereunder, within fifteen (15)

Business Days after demand made from time to time but no more frequently than

monthly, for the use of electrical energy in the Premises as evidenced by the aforesaid

submeter(s), based upon both consumption and demand factors, at the seasonally adjusted

rate then payable by Landlord to the utility company providing service to the Building

(net of any energy rebates or energy cost savings received by Landlord with respect to the Building), plus an amount equal to three percent (3%) thereof to reimburse Landlord for its overhead, administration and supervision in connection therewith.  For purposes of this Article 15, the rate to be paid by Tenant shall include any taxes, energy charges, demand charges, fuel adjustment charges, rate adjustment charges, or other charges actually imposed on and paid by Landlord in connection therewith.  If any tax is imposed upon Landlord's receipts from the sale or resale of electrical energy to Tenant by any federal, state, city or local authority, the pro-rata share of such tax allocable to the electrical energy service received by Tenant shall be passed onto and paid by Tenant as Additional Charges if and to the extent permitted by law.  Upon request from time to time, Landlord shall make available to Tenant a copy of its bill from the utility company and any other documentation reasonably requested by Tenant in order to confirm the charges billed to Tenant pursuant to this Section 15.1.  Landlord (or, so long as the Prior Lease is in full force and effect, Master Tenant) shall test such submeter for accuracy at least once per calendar year.

(b)      Landlord's failure during the term of this Lease to prepare and deliver any statements or bills under this Article 15 or Landlord's failure to make a demand under this Article15 or any other provisions of this Lease, shall not in any way be deemed to be a waiver of, or cause Landlord to forfeit or surrender its rights to collect, any amount of Additional Charges which may have become due pursuant to this Article 15 during the term of this Lease (*provided* that such statement or bill is given within twelve (12) months after the incurrence of the actual charge).  Tenant's liability for any

amounts due under this <u>Article 15</u> shall continue unabated during the remainder of the Term and shall survive the expiration or sooner termination of this Lease.

(c)    In order that Landlord may at all times have all necessary information which it requires in order to maintain and protect its equipment, Tenant agrees that Tenant will not make any material alteration or material addition to the electrical equipment in the Premises without the prior written consent of Landlord (or, so long as the Master Lease is in full force and effect, of Master Tenant) in each instance (which consent will not be unreasonably withheld or delayed) and will promptly advise Landlord (or, so long as the Master Lease is in full force and effect, Master Tenant) of any other material alteration or addition to such electrical equipment (other than de minimis alterations or additions, considered in the aggregate).

(d)    Landlord (or, so long as the Master Lease is in full force and effect, Master Tenant) may, at its option, upon not less than ninety (90) days' prior written notice to the Tenant (or such longer time as may be required to make arrangements with the electric utility for direct service provided Tenant exercises commercially reasonable efforts to complete said arrangements as soon as possible), discontinue the furnishing of electric current to the Premises or any part thereof and, in such event, the Tenant shall contract for the supplying of such electric current thereto with the public service company supplying electric current to the neighborhood and Landlord (or, so long as the Master Lease is in full force and effect, Master Tenant) (at the reasonable cost of Landlord or Master Tenant, as applicable) shall supply suitable cable risers, conduits, panels, switches, meters and feeders to serve the Premises available, for the purpose of supplying such electric current.

15.2    In the event that Tenant shall require electric current for use in the Premises in excess of such reasonable quantity to be furnished as provided in this Lease and if, in the Landlord's (or, so long as the Master Lease is in full force and effect, Master Tenant's) reasonable judgment, such excess requirements cannot be furnished unless additional risers, conduits, feeders, switchboards and/or appurtenances are installed in the Building, Landlord (or, so long as the Master Lease is in full force and effect, Master Tenant), upon written request of the Tenant, will proceed with reasonable diligence to install such additional risers, conduits, feeders, switchboards and/or appurtenances provided the same and the use thereof shall be permitted by applicable Legal Requirements and Insurance Requirements and shall not cause permanent damage or injury to the Building or the Premises or cause or create a dangerous or hazardous condition or entail excessive or unreasonable alterations or repairs or interfere with or disturb other tenants or occupants of the Building, and the Tenant agrees to pay all actual, reasonable costs and expenses incurred by Landlord in connection with such installation and to maintain on deposit with Landlord such security for the payment by the Tenant of all such costs and expenses as Landlord shall from time to time reasonably request.

15.3    Landlord shall not be liable or responsible to Tenant for any loss, damage or expense that Tenant sustains or incurs if either the quantity or character of electric service is changed or interrupted or is no longer available or suitable for Tenant's requirements unless due to the negligence or willful misconduct of Landlord, its agents, employees or contractors.

15.4    Tenant shall have the right to audit, with reasonable frequency and otherwise in a reasonable manner, Landlord's records with respect to Tenant's electric uses and charges.

## ARTICLE 16

## OTHER UTILITIES

16.1    At no charge to Tenant (other than under Article 15), Landlord shall install, maintain and operate a 2-pipe console heat pump system consistent with the residential rental portion of the Building, to service the Premises, to the extent not so installed, prior to the Master Lease End Date, by Landlord or Master Tenant pursuant to the Prior Lease.

16.2    Tenant will at all times abide with all regulations and requirements which Landlord (or, so long as the Master Lease is in full force and effect, Master Tenant) may reasonably prescribe for the proper functioning and protection of such heat pump system, but Landlord (or, so long as the Master Lease is in full force and effect, Master Tenant) shall be responsible for the repair, maintenance and (if and to the extent necessary) replacement of the same (unless the need for such repair, maintenance or replacement arises from the Tenant Repair Criteria, in which case Tenant shall be responsible therefor).

16.3    The heating, ventilating and/or air-conditioning systems servicing the Premises are designed to provide comfortable occupancy of the Premises.  Use of the Premises or any part thereof in a manner exceeding the heating, ventilating and/or air-conditioning design conditions (including occupancy and connected electrical load) may require changes in the heating, ventilating and/or air-conditioning systems servicing the

Premises in order to provide comfortable occupancy.  Such changes shall be made at Tenant's expense as Alterations in accordance with the provisions of Article 12, but only to the extent permitted and upon the conditions set forth in Article 12.

16.4    Landlord (or, so long as the Master Lease is in full force and effect, Master Tenant) shall furnish adequate hot and cold water to the Premises for customary hotel purposes (including for bathrooms, drinking and cleaning) and, subject to Section 16.3, shall furnish adequate heating, ventilating and air-conditioning for customary hotel purposes, at no charge (other than under Article 15).  At no charge to Tenant (other than under Article 15), Landlord shall install such wiring (i) consistent with the residential rental portion of the Building as is required for Tenant to obtain (at Tenant's sole and expense and directly with the appropriate service providers) telephone and cable TV service to the Hotel Rooms at the Premises, and (ii) as otherwise set forth on Exhibit C, in each case, to the extent not so installed, prior to the Master Lease End Date, by Landlord or Master Tenant pursuant to the Prior Lease.

16.5    All other utilities not described in Article 15 or this Article 16 shall be the responsibility of Tenant to obtain, at Tenant's sole cost and expense.

### ARTICLE 17

### OTHER SERVICES; SERVICE INTERRUPTION

17.1    Subject to Section 3.2 of this Lease and any reasonable measures in the event of an emergency, Landlord shall not prevent Tenant from having access to the Premises on a 24/7/365 basis.

17.2     Subject to the abatement of Base Rent under Section 14.3,

Landlord (or, so long as the Master Lease is in full force and effect, Master Tenant) shall

have the right, without affecting Tenant's obligations under this Lease, to temporarily

stop or interrupt or reduce service of any of the heating, ventilating, air conditioning,

electric, sanitary, elevator, sprinkler, water or other Building systems, or to temporarily

stop or interrupt or reduce any other services required of Landlord under this Lease

(whether or not specified in Article 15 or in this Article 17), whenever and for so long as

may be reasonably necessary, by reason of (a) Force Majeure Events or (b) the making of

repairs, additions, changes or replacements which Landlord (or, so long as the Master

Lease is in full force and effect, Master Tenant) is required or permitted to make or in

good faith deems necessary except in the event of emergency (which event of emergency

shall be as reasonably determined by Landlord), Landlord agrees to exercise its rights

under this Section 17.2 only after reasonable advance notice to Tenant.  In any event,

Landlord shall use commercially reasonable efforts to exercise such rights at times and in

a manner so as to minimize interference with Tenant's business operations in the

Premises.

## ARTICLE 18

### ACCESS, NOTICE OF OCCURRENCES, WINDOWS,
### NAME OF BUILDING AND NO DEDICATION

18.1     Except for the space below the hung ceiling and above the floor

and bounded by the interior surfaces of the walls, windows and doors bounding the

Premises, all of the Building, including exterior Building walls, core corridor walls and

doors and any core corridor entrances, any terraces or roofs adjacent to the Premises and

any space in or adjacent to the Premises used for shafts, stacks, pipes, conduits, fan rooms, ducts, electric or other utilities, sinks or other Building facilities, and the use thereof, as well as access thereto through the Premises for the purposes of operation, maintenance, decoration and repair, are reserved to Landlord (or, so long as the Master Lease is in full force and effect, to Master Tenant); *provided, however*, that Tenant shall have the right to place lines, wires, and other communication and electrical facilities in the plenum above the hung ceiling if such lines, wires and other facilities are plenum rated, fire retardant and otherwise in compliance with all Legal Requirements and any requirements Landlord (or, so long as the Master Lease is in full force and effect, Master Tenant) may reasonably impose thereon.  Landlord (or, so long as the Master Lease is in full force and effect, Master Tenant) shall have the right, at any time, without affecting any of Tenant's obligations under this Lease, to install, erect, use and maintain pipes, ducts and conduits in and through the Premises (*provided* that any such pipes, ducts or conduits are either located within walls or placed adjacent to walls and appropriately furred), and to make such changes, alterations, additions and improvements in or to the Building and common areas as Landlord (or, so long as the Master Lease is in full force and effect, Master Tenant) deems necessary or desirable.

18.2    Landlord and its agents and representatives shall have the right to enter and/or pass through and/or be on the Premises from time to time, at reasonable hours and upon reasonable notice to Tenant, to examine the Premises and to show the Premises to actual or prospective Superior Lessors or Superior Mortgagees, to prospective purchasers of the Building or (only during the last six (6) months of the term hereof) to prospective tenants.  Landlord and its agents, representatives and contractors

(including cleaning contractors), and their respective employees (a) shall have the right to

enter and/or pass through and/or be on the Premises to clean the Premises and to make

such repairs, alterations and improvements in or to the Building as Landlord (or, so long

as the Master Lease is in full force and effect, Master Tenant) requires or reasonably

desires to make and (b) shall have the right to use, without charge therefor, all light,

power and water in the Premises while making repairs or alterations in the Premises.

Landlord and its agents and representatives shall have the right to take all materials into

and on the Premises that may be required in connection therewith and such acts shall not

be deemed an actual or constructive eviction and shall have no effect upon Tenant's

obligations under this Lease.  During the period of twelve (12) months prior to the

Expiration Date, Landlord and its agents may exhibit the Premises to prospective tenants

upon reasonable advance notice to Tenant.  The condominium board and its employees,

agents, representatives and designees shall be afforded all rights of entry set forth in the

Condominium Declaration.  If during the last thirty (30) days of the Term, Tenant has

removed all or substantially all Tenant's Property from the Premises, Landlord may,

without notice to Tenant, immediately enter the Premises and alter, renovate and decorate

the Premises, and such acts shall not be deemed an actual or constructive eviction and

shall have no effect upon Tenant's obligations under this Lease.

18.3     Subject to Section 14.3, if at any time any windows of the

Premises are temporarily darkened or obstructed by reason of any repairs, improvements,

maintenance and/or cleaning in or about the Building, or if any part of the Building other

than the Premises and such common areas as are reasonably required for access to the

Premises is temporarily or permanently closed or inoperable, any such occurrence shall

not be deemed an actual or constructive eviction and shall have no effect upon Tenant's
obligations under this Lease.

18.4    Landlord may adopt any name for the Building, and Landlord shall
have the right to change the name and/or address of the Building at any time and from
time to time.

18.5    Landlord and its agents shall have the right to permit access to the
Premises at any time, whether or not Tenant shall be present, (a) by any receiver, trustee,
sheriff, marshal or other public official entitled to, or reasonably purporting to be entitled
to, such access (i) for the purpose of taking possession of or removing any property of
Tenant or of any other occupant of the Premises, or (ii) for any other lawful purpose, or
(b) by any representative of the fire, police, building, sanitation or other department or
instrumentality of any borough, city, state or federal government entitled to, or
reasonably purporting to be entitled to, such access.  Nothing contained in, nor any action
taken by Landlord under this Section 18.5, shall be deemed to constitute recognition by
Landlord that any person other than Tenant has any right or interest in this Lease or the
Premises.

18.6    Tenant shall give prompt notice to Landlord of any of the
following of which Tenant becomes aware:  (a) any occurrence in or about the Premises
for which Landlord might be liable, (b) any fire or other casualty in the Premises, (c) any
damage to or defect in the Premises, including the fixtures, equipment and appurtenances
thereof, for the repair of which Landlord might be responsible, and (d) any damage to or
defect in any part of the Building's sanitary, electrical, sprinkler, heating, ventilating, air
conditioning, plumbing, elevator or other systems in or passing through the Premises.

18.7    If an excavation is made upon land adjacent to or under the Building, or is authorized to be made, Tenant shall afford to the person causing or authorized to cause such excavation, license to enter the Premises for the purpose of performing such work as said person deems necessary or desirable to preserve and protect the Building from injury or damage and to support same by proper foundations, and same shall not be deemed an actual or constructive eviction and shall have no effect on Tenant's obligations under this Lease.

18.8    Prior to any entry by Landlord into the Premises (other than routine cleaning, and except emergency situations), Landlord shall use reasonable efforts to give reasonable advance notice thereof to Tenant (which may be by telephone, email or fax), and Tenant shall have the right to have a representative accompany Landlord's personnel during the course of any such entry.  If Tenant is not present when for any reason entry into the Premises is necessary or permissible, Landlord or Landlord's agents may enter same by a master key without rendering Landlord or such agents liable therefor (if during such entry Landlord or such agents accord reasonable care to Tenant's Property), and such entry shall not be deemed an actual or constructive eviction and shall have no effect upon Tenant's obligations under this Lease.

18.9    In exercising its rights under this Article 18, Landlord shall use reasonable efforts under the circumstances to avoid disruption to Tenant's members and guests.

## ARTICLE 19

## LIABILITY AND INDEMNIFICATION

19.1    None of Landlord, any Superior Lessor or any Superior Mortgagee shall be liable to Tenant for any loss, injury or damage to Tenant or to any other person (including without limitation Tenant's members and guests), or to its or their property, irrespective of the cause of such injury, damage or loss, unless caused by or resulting from their own negligence or willful misconduct or the negligence or willful misconduct of their respective agents, contractors or employees, in the operation or maintenance of the Premises or the Building.  None of Landlord, any Superior Lessor or any Superior Mortgagee shall be liable (a) for any damage caused by other tenants or persons in, on or about the Building, or (b) even if resulting from negligence or willful misconduct, for consequential damages of Tenant or any subtenant or licensee of Tenant.

19.2    Notwithstanding any provision to the contrary, Tenant shall look solely to the estate and property of Landlord in and to the Property and the proceeds thereof in the event of any claim against Landlord or any member, partner, director, officer, agent or employee of Landlord arising out of or in connection with this Lease, the relationship of Landlord and Tenant or Tenant's use of the Premises, and the liability of Landlord arising out of or in connection with this Lease, the relationship of Landlord and Tenant or Tenant's use of the Premises, shall be limited to such estate and property of Landlord.  No other properties or assets of Landlord or any member, partner, director, officer, agent or employee of Landlord shall be subject to levy, execution or other enforcement procedures for the satisfaction of any judgment (or other judicial process) or for the satisfaction of any other remedy of Tenant arising out of or in connection with this

Lease, the relationship of Landlord and Tenant or Tenant's use of the Premises, and if

Tenant acquires a lien on or interest in any other properties or assets by judgment or

otherwise, Tenant shall promptly release such lien or interest in such other properties and

assets by executing, acknowledging and delivering to Landlord an instrument to that

effect prepared by Landlord's attorneys.

        19.3    Tenant shall indemnify and hold harmless Landlord and the other

Landlord Parties against all losses, costs, liabilities, claims, damages, fines, penalties and

expenses (including reasonable attorneys' fees and disbursements) in connection with

(a) the conduct or management of the Premises or of any business therein, or any work or

thing done, or any condition created (other than by Landlord, Master Tenant, any

Landlord Party or their invitees) in or about the Premises during the Term, the term of the

Prior Lease or during the period of time, if any, prior to the Prior Lease Commencement

Date that Tenant is given access to the Premises, including, without limitation, the

performance of any Alterations by or on behalf of Tenant, (b) any act, omission or

negligence of Tenant or any member, occupant, subtenant or licensee or their respective

employees, agents, contractors, guests or invitees, (c) any accident, injury or damage

(except to the extent caused by the negligence or willful misconduct of Landlord,

Superior Landlord, Superior Mortgagee or Master Tenant) occurring in, at or upon the

Premises, (d) the failure of Tenant or any occupant, subtenant or licensee (other than

Master Tenant) or their respective members, employees, agents, contractors, guests or

invitees to comply with those Legal Requirements and Insurance Requirements which are

to be complied with by Tenant pursuant to the terms of this Lease, or (e) any other breach

or default by Tenant under this Lease.  Notwithstanding the foregoing, Tenant shall not

be obligated to indemnify or hold harmless any Landlord Party to the extent of any

Landlord Party's negligence or willful misconduct, or against any consequential

damages.

19.4    If any claim, action or proceeding is made or brought against a

party indemnified under this Lease (whether in Section 19.3 or another provision of this

Lease) ("**Indemnitee**"), then upon demand by Indemnitee, the indemnifying party

("**Indemnitor**"), at Indemnitor's sole cost and expense, shall resist or defend such claim,

action or proceeding in Indemnitee's name, if necessary, by the attorneys for

Indemnitor's insurance carrier (if such claim, action or proceeding is covered by

insurance), or otherwise by such attorneys as Indemnitee shall approve, which approval

shall not be unreasonably withheld or delayed, and Indemnitee shall cooperate, at no cost

to itself unless reimbursed by Indemnitor, with Indemnitor's counsel or such insurance

carrier, in the defense of such claim.  Indemnitee shall not enter into any settlement of

any such claim without the prior written consent of Indemnitor.  Indemnitee shall notify

Indemnitor promptly of any claim, action or proceeding made or brought against

Indemnitee as to which indemnification may be sought hereunder.  If Indemnitee shall

fail to timely notify Indemnitor of a claim and, as a result of such failure, Indemnitor's

insurance coverage is prejudiced, or Indemnitor is otherwise materially prejudiced in the

defense of such claim, Indemnitor shall be released from its obligation to indemnify

Indemnitee, but only to the extent of such prejudice.

19.5    The terms and provisions of this Article 19 shall survive the

expiration or termination of this Lease.

# ARTICLE 20

## DAMAGE OR DESTRUCTION

20.1    If the Building is partially or totally damaged or destroyed by fire or other casualty (and this Lease is not terminated as provided in this Article 20), Landlord (or, so long as the Prior Lease is in full force and effect, Master Tenant) shall repair the damage and restore and rebuild the Building (except for Tenant's Property) with reasonable diligence after notice to it of the damage or destruction.

20.2    If all or part of the Premises is damaged or destroyed or rendered completely or partially untenantable, unusable or inaccessible by fire or other casualty, Base Rent and charges for electricity shall be reduced or abated in the proportion that the untenantable, unusable or inaccessible area of the Premises bears to the total rentable square feet of the Premises for the period from the date of the damage or destruction to (a) the date the damage to the Premises is substantially repaired, Landlord (or, so long as the Prior Lease is in full force and effect, Master Tenant) gives Tenant notice thereof and possession of the applicable portion of the Premises is tendered to Tenant or (b) if the Building and not the Premises is so damaged or destroyed, the date on which the Premises is made tenantable and Landlord (or, so long as the Prior Lease is in full force and effect, Master Tenant) gives Tenant reasonable prior notice thereof; *provided, however*, that, should Tenant reoccupy a portion of the Premises for the use thereof during the period in which repair work is taking place and prior to the date the Premises is substantially repaired or made tenantable, Base Rent allocable to such reoccupied portion, based upon the proportion which area of the reoccupied portion of the Premises

bears to the total rentable square feet of the Premises, shall be payable by Tenant from the date of such occupancy.

20.3    If the Premises is materially (i.e., 50% or more) damaged or destroyed by fire or other casualty, or if the Building is so damaged or destroyed by fire or other casualty (whether or not the Premises is damaged or destroyed) that its repair or restoration requires the expenditure (as estimated by a reputable contractor or architect designated by Landlord (or, so long as the Prior Lease is in full force and effect, Master Tenant)) of more than 50% of the full insurable value of the Building immediately prior to the fire or other casualty (each a "**Substantial Casualty**"), and in either case Landlord (or, so long as the Prior Lease is in full force and effect, Master Tenant) does not intend to restore the Building, then in either such case Landlord may terminate this Lease by giving Tenant notice to such effect within one hundred eighty (180) days after the date of the fire or other casualty and Base Rent and electric charges shall be prorated and adjusted as of the date of such damage or destruction (taking into account the abatement provided in Section 20.2). If the Prior Lease is terminated pursuant to Section 20.3 of the Prior Lease, this Lease shall automatically terminate simultaneously with such termination of the Prior Lease.

20.4    If a Substantial Casualty shall occur and Landlord shall not elect to terminate this Lease (and if this Lease does not terminate pursuant to the last sentence of Section 20.3) under Section 20.3, Landlord (or, so long as the Prior Lease is in full force and effect, Master Tenant) shall send a notice to Tenant within ninety (90) days after such Substantial Casualty setting forth Landlord's (or, so long as the Prior Lease is in full force and effect, Master Tenant's) estimate of the length of time necessary to restore the

Premises to a tenantable condition.  If Landlord's (or, so long as the Prior Lease is in full

force and effect, Master Tenant's) estimate exceeds twelve (12) months from the date of

the Substantial Casualty, then Tenant may elect to terminate this Lease upon written

notice to Landlord within fifteen (15) days after receipt of Landlord's notice, *provided*

that, if the Prior Lease is then in full force and effect, Tenant simultaneously terminates

the Prior Lease.  If Tenant does not elect to terminate this Lease, and the restoration of

the Premises is not substantially completed within such 12-month period, then Tenant

shall have the right to terminate this Lease upon notice to Landlord effective as of the

thirtieth (30th) day following Tenant's termination notice, *provided* that the restoration

has not been substantially completed by such thirtieth (30th) day.  If the Prior Lease is

terminated pursuant to Section 20.4 of the Prior Lease, this Lease shall automatically

terminate simultaneously with such termination of the Prior Lease.

       20.5    Tenant shall not be entitled to terminate this Lease by reason of a

casualty except as set forth in Section 20.4, and no damages, compensation or claim shall

be payable by Landlord for inconvenience, loss of business or annoyance arising from

any repair or restoration of any portion of the Premises or of the Building pursuant to this

Article 20.  Landlord shall use reasonable efforts to make such repair or restoration

promptly and in such manner as not to unreasonably interfere with Tenant's use and

occupancy of the Premises.

       20.6    Landlord will not carry insurance of any kind on Tenant's Property

and shall not be obligated to repair any damage to or replace Tenant's Property.

       20.7    In connection with the matters described in this Article 20, each of

Landlord and Tenant shall act reasonably and in good faith to coordinate its actions with

those of any condominium board for the Building and its agents, representatives and contractors.

20.8    The provisions of this Article 20 shall be deemed an express agreement governing any case of damage or destruction of the Premises by fire or other casualty, and Section 227 of the Real Property Law of the State of New York, providing for such a contingency in the absence of an express agreement, and any other law of like import, now or hereafter in force, shall have no application in such case and are hereby waived by the parties hereto.

## ARTICLE 21

## EMINENT DOMAIN

21.1    Except as otherwise provided in Section 21.5, if all or substantially all of the Building or the Premises is taken by condemnation or in any other manner for any public or quasi-public use or purpose, this Lease shall terminate as of the date of vesting of title on such taking ("**Date of Taking**"), and Base Rent shall be prorated and adjusted as of such date.

21.2    Except as otherwise provided in Section 21.5, if any material part (but less than the whole) of the Building or the Land is so taken, this Lease shall be unaffected by such taking, except that (a) Landlord may, at its option, terminate this Lease by giving Tenant notice to that effect within ninety (90) days after the Date of Taking, *provided* that, if the Prior Lease is then in full force and effect, Master Tenant simultaneously terminates the Prior Lease, and (b) if ten percent (10%) or more of the Premises is so taken and the remaining area of the Premises is not reasonably sufficient for Tenant to continue commercially reasonable operations as previously conducted at the

Premises, Tenant may terminate this Lease by giving Landlord notice to that effect within ninety (90) days after the Date of Taking, *provided* that, if the Prior Lease is then in full force and effect, Tenant simultaneously terminates the Prior Lease. This Lease shall terminate on the date that such notice from Landlord or Tenant to the other shall be given, *provided* that, if the Prior Lease is then in full force and effect but is terminated pursuant to Section 21.2 thereof, this Lease shall terminate automatically simultaneously with such termination of the Prior Lease, and Base Rent and Additional Charges shall be prorated and adjusted as of such termination. Upon such partial taking and this Lease continuing in force as to any part of the Premises, Base Rent shall be equitably adjusted according to the rentable area remaining.

21.3    Except as otherwise provided in this Section 21.3 or in Section 21.5, Landlord (or, so long as the Prior Lease is in full force and effect, Master Tenant) shall be entitled to receive the entire award or payment in connection with any taking without deduction therefrom for any estate vested in Tenant by this Lease or otherwise and Tenant shall receive no part of such award. Tenant hereby assigns to Landlord all of Tenant's right, title and interest in and to all such awards or payments. The foregoing, however, shall not preclude Tenant from seeking to recover a separate award for Tenant's moving expenses, Tenant's Property and Tenant's leasehold interest, *provided* that such award does not reduce and is not payable out of the award for the Property.

21.4    Except as otherwise provided in Section 21.5, in the event of any taking of less than the whole of the Building and/or Land which does not result in termination of this Lease, Landlord (or, so long as the Prior Lease is in full force and

effect, Master Tenant), whether or not any award or awards shall be sufficient for the purpose, shall proceed with reasonable diligence to repair the remaining parts of the Building (other than Tenant's Property) to substantially their former condition to the extent that same is feasible (subject to reasonable changes which Landlord (or, so long as the Prior Lease is in full force and effect, Master Tenant) reasonably deems desirable) and so as to constitute the Building complete and tenantable.

21.5    If the temporary use or occupancy of all or any part of the Premises is taken by condemnation or in any other manner for any public or quasi-public use or purpose, this Lease and the Term shall remain unaffected by such taking and Tenant shall continue to be responsible for all of its obligations under this Lease (except to the extent prevented from so doing by reason of such taking). In such event Tenant shall be entitled to claim, prove and receive the entire award for such taking unless the period of temporary use or occupancy extends beyond the Expiration Date, in which event Landlord shall be entitled to claim, prove and receive that portion of the award attributable to the restoration of the Premises and the balance of such award shall be apportioned between Landlord and Tenant as of the Expiration Date. If such temporary use or occupancy terminates prior to the Expiration Date, Tenant, at its own expense, shall restore the Premises as nearly as possible to its condition prior to the taking (except if such taking occurs during the last two (2) years of the Term).

21.6    In connection with the matters described in this Article 21, each of Landlord and Tenant shall act reasonably and in good faith to coordinate its actions with those of any condominium board for the Building and its agents, representatives and contractors.

# ARTICLE 22

## SURRENDER AND HOLDING OVER

22.1     On the Expiration Date or on any earlier termination of this Lease or on any reentry by Landlord on the Premises, Tenant (together with all members, guests, occupants, subtenants and licensees and any other party claiming by, through or under Tenant) shall quit and surrender the Premises to Landlord vacant, "broom clean" and in good order, condition and repair, except for ordinary wear and tear, damage or destruction by fire and other casualty and such other damage as Landlord is required to repair or restore under this Lease or Master Tenant is required to repair or restore under the Prior Lease, and Tenant shall remove all Tenant's Property therefrom except as otherwise expressly provided in this Lease.  Prior to such Expiration Date or earlier termination date, (a) Tenant shall (at Tenant's sole cost and expense) permanently close the Cloak Room Opening and the Service Elevator Access (from the 60 Pine Street side only), in a commercially reasonable manner and in compliance with applicable law (and such obligation shall survive the expiration or termination of this Lease) and (b) Landlord shall (at Landlord's sole cost and expense) permanently close the Cloak Room Opening and the Service Elevator Access (from the Building side only), in a commercially reasonable manner and in compliance with applicable law (and such obligation shall survive the expiration or termination of this Lease).  No act or thing done by Landlord or its agents or employees shall be deemed an acceptance of a surrender of this Lease or the Premises, and no agreement to accept such surrender shall be valid unless in writing and signed by Landlord.

22.2    If Tenant (or any member, guest, occupant, subtenant or licensee, or any other party claiming by, through or under Tenant) remains in possession of the Premises after the termination of this Lease without the execution of a new lease, Tenant, at the option of Landlord, shall be deemed to be occupying the Premises as a tenant from month to month, subject to all of the other terms and conditions of this Lease insofar as the same are applicable to a month-to-month tenancy, but at a monthly rental equal to 125% (increased to 150% after the first fifteen (15) days and to 200% after the first thirty (30) days) of the monthly Base Rent last payable by Tenant hereunder, plus all Additional Charges payable hereunder.  In addition, Tenant will indemnify and hold Landlord harmless from all loss, damage or expense that Landlord may suffer or incur (including, without limitation, losses resulting from Landlord's inability to give possession of the Premises to another tenant or to any owner in fee of the Property or any Superior Landlord) resulting from such holding over by Tenant.  Nothing contained in this Section 22.2 shall (i) imply any right of Tenant to remain in the Premises after the termination of this Lease without the execution of a new lease, (ii) imply any obligation of Landlord to grant a new lease or (iii) be construed to limit any right or remedy that Landlord has against Tenant as a holdover tenant or trespasser.

22.3    Tenant expressly waives, for itself and for any person claiming through or under Tenant, any rights which Tenant or any such person may have under the provisions of Section 2201 of the New York Civil Practice Law and Rules and of any similar or successor law of same import then in force, in connection with any holdover proceedings which Landlord may institute to enforce the terms and conditions of this Lease.

22.4    The terms and provisions of this Article 22 shall survive the

expiration or termination of this Lease.

## ARTICLE 23

## DEFAULT

23.1    This Lease is subject to the limitations that:

(a)    if Tenant defaults in the payment of any Base Rent and

such default continues for ten (10) Business Days after notice thereof from Landlord to

Tenant, or if Tenant defaults in the payment of any Additional Charges and such default

continues for thirty (30) days after notice thereof from Landlord to Tenant; or

(b)    if Tenant, whether by action or inaction, is in default of any

of its obligations under this Lease (other than a default otherwise described in this

Section 23.1) and such default continues and is not remedied within thirty (30) days after

Landlord gives to Tenant a notice specifying the same, or, in the case of any such default

which with due diligence cannot be cured within a period of thirty (30) days and the

continuance of which for the period required for cure will not (i) subject Landlord or any

Superior Lessor or Superior Mortgagee to prosecution for a crime (as more particularly

described in Section 9.2) or (ii) result in a default under any Superior Lease or any

Superior Mortgage, if Tenant does not, (x) within said 30-day period advise Landlord of

Tenant's intention to take all steps necessary to remedy such default, (y) duly commence

within said 30-day period and thereafter diligently prosecute to completion all steps

necessary to remedy the default, and (z) complete such remedy within a reasonable time

after the date of said notice from Landlord; or

(c)    if Tenant makes an assignment for the benefit of creditors, or files a voluntary petition under any Insolvency Laws, or if a petition is filed by Tenant under the reorganization provisions of any Insolvency Laws, or if a petition is filed by Tenant under the arrangement provisions of any Insolvency Laws, or if a receiver of Tenant or of or for the property of Tenant is appointed; or

(d)    if an involuntary petition alleging an act of bankruptcy or insolvency is filed against Tenant under any Insolvency Laws, and the applicable proceeding is not dismissed within ninety (90) days;

(e)    if Tenant vacates and abandons the Premises without properly securing the same; or

(f)    during such time as the Prior Lease is in full force and effect, any "Event of Default" as defined in the Prior Lease;

then, in any of said cases (each, an "**Event of Default**"), Landlord may give to Tenant a notice of intention to terminate this Lease at the expiration of five (5) Business Days after the date of the service of such notice of intention, and upon the expiration of said five (5) Business Day period this Lease, whether or not the Term had commenced, shall terminate with the same effect as if that day were the Expiration Date, but Tenant shall remain liable for damages as provided in Article 25. Notwithstanding the foregoing, during such time that the Prior Lease is in full force and effect, Landlord shall not have the right to terminate this Lease unless the Prior Lease is contemporaneously terminated or terminates in accordance with the terms of the Prior Lease (for the avoidance of doubt, it being understood that nothing in this sentence shall be deemed to limit or modify (i) any rights or remedies of Landlord under this Lease, other than the right to terminate this

Lease, during such time that the Prior Lease is in full force and effect or (ii) any rights or remedies of Landlord, including the right to terminate this Lease in accordance with the terms hereof upon an Event of Default, during such time that the Prior Lease is no longer in full force and effect).

## ARTICLE 24

### RE-ENTRY BY LANDLORD

24.1    If this Lease terminates as provided in Article 23, Landlord or Landlord's agents may immediately or at any time thereafter re-enter the Premises, or any part thereof, either by summary dispossess proceedings or by any suitable action or proceeding at law, and may repossess same, and may remove any person therefrom, to the end that Landlord may have, hold and enjoy the Premises. The word "re-enter" as used herein, is not restricted to its technical legal meaning. If this Lease is terminated under the provisions of Article 23, or if Landlord re-enters the Premises under the provisions of this Article 24, or in the event of the termination of this Lease, or of re-entry, by or under any summary dispossess or other proceeding or action or any provision of law by reason of default hereunder on the part of Tenant, Tenant shall thereupon pay to Landlord Base Rent and Additional Charges payable to the time of such termination of this Lease, or of such recovery of possession of the Premises by Landlord, as the case may be, and shall also pay to Landlord damages as provided in Article 25.

24.2    In the event of a breach or threatened breach by Tenant of any of its obligations under this Lease, Landlord shall have the right to seek an injunction to enjoin such breach or threatened breach. The special remedies to which Landlord may resort hereunder are cumulative and are not intended to be exclusive of any other

remedies to which Landlord may lawfully be entitled at any time and such party may invoke any remedy allowed at law or in equity as if specific remedies were not provided for herein.

24.3    If this Lease is terminated under the provisions of Article 23, or if Landlord re-enters the Premises under the provisions of this Article 24, or in the event of the termination of this Lease, or of re-entry, by or under any summary dispossess or other proceeding or action or any provision of law by reason of default hereunder on the part of Tenant, Landlord shall be entitled to retain all monies, if any, paid by Tenant to Landlord, whether as advance rent, security or otherwise, but such monies shall be credited by Landlord against any Base Rent or Additional Charges due from Tenant at the time of such termination or re-entry or, at Landlord's option, against any damages payable by Tenant under Article 25 or pursuant to law.

24.4    The terms and provisions of this Article 24 shall survive the expiration or termination of this Lease.

## ARTICLE 25

### DAMAGES

25.1    If this Lease is terminated under the provisions of Article 23, or if Landlord re-enters the Premises under the provisions of Article 24, or in the event of the termination of this Lease, or of re-entry, by or under any summary dispossess or other proceeding or action or any provision of law by reason of default hereunder on the part of Tenant, Tenant shall pay to Landlord as damages, at the election of Landlord, either:

(a)        a sum which at the time of such termination of this Lease or
at the time of any such re-entry by Landlord, as the case may be, represents the then
value of the excess, if any, of (i) the aggregate amount of Base Rent and Additional
Charges which would have been payable by Tenant (conclusively presuming the average
monthly Additional Charges to be the same as were payable for the twelve-month period,
or if less than twelve (12) months have then elapsed since the Commencement Date, the
partial year, immediately preceding such termination or re-entry) for the period
commencing with such earlier termination of this Lease or the date of any such re-entry,
as the case may be, and ending with the date that would have been the Expiration Date if
this Lease had not so terminated or if Landlord had not so re-entered the Premises, over
(ii) the aggregate fair market rental value of the Premises for the same period, both
discounted to their present value at the rate of four percent (4%) per annum, or

(b)        sums equal to the Base Rent and Additional Charges which
would have been payable by Tenant had this Lease not so terminated, or had Landlord
not so re-entered the Premises, payable upon the due dates therefor (as provided in this
Lease) following such termination or such re-entry until the date that would have been
the Expiration Date if this Lease had not so terminated or if Landlord had not so re-
entered the Premises, *provided*, *however*, that if Landlord shall relet the Premises during
said period, Landlord shall credit Tenant with the net rents received by Landlord from
such reletting, such net rents to be determined by first deducting from the gross rents as
and when received by Landlord from such reletting the expenses incurred by Landlord in
terminating this Lease or in re-entering the Premises and in securing possession thereof,
as well as the expenses of reletting, including altering and preparing the Premises for new

Tenants, brokers' commissions, reasonable attorneys' fees and disbursements, and all

other expenses, it being understood that any such reletting may be for a period shorter or

longer than what would have been the unexpired portion of the Term if this Lease had not

so terminated or if Landlord had not so re-entered the Premises, but in no event shall

Tenant be entitled to receive any excess of such net rents over the sums payable by

Tenant to Landlord hereunder, nor shall Tenant be entitled in any suit for the collection of

damages pursuant to this subdivision to a credit in respect of any net rents from a

reletting, except to the extent that such net rents are actually received by Landlord.  If the

Premises or any part thereof is relet in combination with other space, then proper

apportionment on a per square foot basis shall be made of the rent received from such

reletting and of the expenses of reletting.

If the Premises or any part thereof is relet by Landlord for what would have been

the unexpired portion of the Term if this Lease had not so terminated, or if Landlord had

not so re-entered the Premises, before presentation of proof of such damages to any court,

commission or tribunal, the amount of rent set forth in any bona fide third-party lease(s)

in connection with such reletting shall, prima facie, be the fair and reasonable rental value

for the Premises, or part thereof, so relet during the term of the reletting.  Landlord shall

have the right to relet the Premises or any part thereof at such rental or rentals and upon

such other terms and conditions, which may include concessions and free rent periods, as

Landlord, in its sole discretion, shall determine.  Landlord shall not be liable in any way

for its failure or refusal to relet the Premises or any part thereof, or if the Premises or any

part thereof is relet, for its failure to collect the rent under such reletting, and no such

refusal or failure to relet or failure to collect rent shall release or affect Tenant's liability for damages or otherwise under this Lease.

25.2    Suit or suits for the recovery of such damages, or any installments thereof, may be brought by Landlord from time to time at its election, and nothing contained herein shall be deemed to require Landlord to postpone suit until the date when the Term would have expired if this Lease had not so terminated or had Landlord not so re-entered the Premises.  Nothing herein contained shall be construed to limit or preclude recovery by Landlord against Tenant of any sums or damages to which, in addition to the damages particularly provided above, Landlord may lawfully be entitled by reason of any default of Tenant hereunder.  Nothing herein contained shall be construed to limit or prejudice the right of Landlord to prove for and obtain as damages by reason of the termination of this Lease or re-entry on the Premises for the default of Tenant under this Lease an amount equal to the maximum allowed by any statute or rule of law in effect at the time when, and governing the proceedings in which, such damages are to be proved whether or not such amount is greater than, equal to, or less than any of the sums referred to in Section 25.1.

25.3    In addition, if this Lease is terminated under the provisions of Article 23, or if Landlord re-enters the Premises under the provisions of Article 24, Tenant agrees that:

(a)    the Premises then shall be in the same condition as that in which Tenant has agreed to surrender the same to Landlord on the Expiration Date,

(b)    Tenant shall have performed prior to any such termination or re-entry any obligation of Tenant contained in this Lease for the making of any

Alteration or for restoring or rebuilding the Premises or the Building, or any part thereof, and

(c)      for the breach of any obligation of Tenant set forth above in this Section 25.3, Landlord shall be entitled immediately, without notice or other action by Landlord, to recover, and Tenant shall pay as and for liquidated damages therefor the cost of performing such obligation (as estimated by an independent contractor selected by Landlord).

25.4    The terms and provisions of this Article 25 shall survive the expiration or termination of this Lease.

## ARTICLE 26

## WAIVERS

26.1    Tenant, on behalf of itself and any and all persons claiming through or under Tenant, does hereby waive and surrender all right and privilege which it, they or any of them might have under or by reason of any present or future law, to redeem the Premises or to have a continuance of this Lease after being dispossessed or ejected therefrom by process of law or under the terms of this Lease or after the termination of this Lease.

26.2    If Tenant is in arrears in payment of Base Rent or Additional Charges, Tenant waives its right, if any, to designate the items to which any payments made by Tenant are to be credited, and Landlord may apply any payments made by Tenant to such items as Landlord sees fit, irrespective of any designation or request by Tenant as to the items to which any such payments shall be credited.

26.3    To the maximum extent permitted by law, Landlord and Tenant hereby waive trial by jury in any action, proceeding or counterclaim brought by either against the other on any matter arising out of or in any way connected with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the Premises, including any claim of injury or damage, and any emergency and other statutory remedy in respect thereof.

26.4    Tenant shall not interpose any counterclaim in any summary proceeding commenced by Landlord to recover possession of the Premises (other than compulsory or mandatory counterclaims) and shall not seek to consolidate such proceeding with any action which may have been or will be brought by Tenant or any other person.

26.5    The failure of either party to insist in any one or more instances upon the strict performance of any one or more of the obligations contained in this Lease, or to exercise any election herein contained, shall not be construed as a waiver or relinquishment for the future of the performance of such one or more obligations contained in this Lease or of the right to exercise such election, but same shall continue and remain in full force and effect in respect of any subsequent breach, act or omission. The receipt by Landlord of Base Rent or Additional Charges with knowledge of breach by Tenant of any obligation contained in this Lease shall not be deemed a waiver of such breach.

26.6    The terms and provisions of this Article 26 shall survive the expiration or termination of this Lease.

## ARTICLE 27

## CURING TENANT'S DEFAULTS AND
## COSTS OF ENFORCEMENT

27.1    If Tenant defaults in the performance of any of Tenant's obligations under this Lease, Landlord (or, so long as the Prior Lease is in full force and effect, Master Tenant), without thereby waiving such default, may (but shall not be obligated to) perform same for the account and at the expense of Tenant, without notice in case of emergency, and in any other case only if such default continues after the expiration of thirty (30) days from the date Landlord or Master Tenant gives Tenant notice of the default.  Bills for any expenses incurred by Landlord in connection with any such performance by it for the account of Tenant, and bills for all reasonable costs, expenses and disbursements of every kind and nature, including reasonable attorneys' fees and disbursements, involved in collecting or endeavoring or endeavoring to enforce any rights against Tenant, under or in connection with this Lease or pursuant to law, including any such cost, expense and disbursement involved in instituting and prosecuting summary proceedings or in recovering possession of the Premises after default by Tenant or upon the Expiration Date or sooner termination of this Lease, and interest on all sums advanced by Landlord under this Section 27.1 at the Lease Interest Rate, may be sent by Landlord to Tenant monthly, or immediately, at Landlord's option, and such amounts shall be due and payable in accordance with the terms of such bills.

27.2    The terms and provisions of this Article 27 shall survive the expiration or termination of this Lease.

## ARTICLE 28

### BROKER

28.1    Each of Tenant and Landlord represents and warrants to the other

that no broker was involved in procuring this Lease, and that it had no conversations or

negotiations with any broker concerning the leasing of the Premises.  Each party shall

indemnify and hold harmless the other party against liability in connection with a breach

of such indemnifying party's representation and warranty in this Article 28 and in

connection with any claim for a brokerage commission arising out of any conversations

or negotiations had by the indemnifying party with any broker.  The indemnity

obligations pursuant to this Section 28.1 shall survive the expiration or termination of this

Lease.

## ARTICLE 29

### NOTICES

29.1    Any notice, consent, approval or other communication required or

permitted to be given by either party to the other or to any Superior Lessor or Superior

Mortgagee (collectively, "**Notices**" and individually, "**Notice**") must be in writing and,

except as otherwise provided in this Article 29, shall be deemed to have been properly

given only if sent by registered or certified mail, return receipt requested, posted in a

United States post office station or letter box in the continental United States, or by

nationally-recognized overnight courier service, in either case addressed to Landlord or

Tenant as the receiving party at its address set forth at the head of this Lease (Attention:

James Hedden in the case of Notices to Landlord and Attention:  President (with a copy

of such Notices to Tenant to Attention:  General Manager) in the case of Notices to

Tenant), and addressed to any Superior Lessor or Superior Mortgagee to it at the last

address of which Landlord or Tenant (whichever may be giving the Notice) was notified.

A Notice shall be deemed to have been given on the third (3rd) Business Day after the day

so mailed or the next Business Day after sent by overnight courier.  Either party may, by

notice as aforesaid, designate a different address for Notices intended for it.

   29.2 Notwithstanding the provisions contained in Section 29.1, any

Notice from Landlord to Tenant of a default by Tenant hereunder may be given by hand

delivery (with receipt of delivery), with a concurrent copy of such Notice sent to Tenant

by registered or certified mail (return receipt requested) as provided in Section 29.1; such

Notice of default given in that manner will be deemed given when hand delivered.

   29.3 Notwithstanding the provisions contained in Section 29.1, any

Notice may be given by hand delivery either in case of an emergency or in case United

States certified and registered mail are both not then operating.  Such Notices will be

deemed given on the date so sent by hand delivery.

   29.4 Landlord shall have the right to reasonably assume that any Notice

from Tenant signed by any person purporting to be an officer of Tenant if Tenant is a

corporation, member of Tenant if Tenant is a limited liability company or a partner in

Tenant if Tenant is a partnership is duly authorized and approved by and binding on

Tenant, and Tenant shall be bound by such Notice whether or not the person signing the

Notice was actually authorized and approved by Tenant.  Tenant shall have the right to

reasonably assume that any Notice from Landlord signed by any person purporting to be

an officer of Landlord if Landlord is a corporation, member of Landlord if Landlord is a

limited liability company or a partner in Landlord if Landlord is a partnership is duly

authorized and approved by and binding on Landlord, and Landlord shall be bound by such Notice whether or not the person signing the Notice was actually authorized and approved by Landlord.

## ARTICLE 30

### ESTOPPEL CERTIFICATES

30.1     Each party shall, at any time and from time to time, as requested by the other party, execute and deliver to the other party within ten (10) Business Days after receipt of such request a statement (a) certifying that this Lease is unmodified and in full force and effect (or if modified, that same is in full force and effect as modified and stating the modifications), (b) certifying the dates to which Base Rent and Additional Charges have been paid, (c) stating whether or not, to the best knowledge of the signing party, the other party is in default in performance of any of its obligations under this Lease, and, if so, specifying each such default of which the signing party has knowledge and (d) stating whether or not, to the best knowledge of the signing party, any condition or event exists which with the giving of notice or passage of time, or both, would constitute such a default, and, if so, specifying each such condition or event.

30.2     Any statement delivered pursuant to this Article 30 shall be deemed a representation and warranty that may be relied upon by the party requesting the statement and by others with whom such party may be dealing, regardless of independent investigation.

30.3     Tenant also shall include in any statement delivered pursuant to this Article 30 such other information concerning this Lease, as any prospective Superior

Mortgagee or Superior Lessor may reasonably require or as Landlord may reasonably request.

## ARTICLE 31

### FORCE MAJEURE

31.1    Except as may be otherwise set forth in this Lease, this Lease and the obligations of Tenant to pay Base Rent and Additional Charges hereunder and to perform all of the other covenants and agreements hereunder on the part of Tenant to be performed shall not be affected, impaired or excused because Landlord is unable to fulfill, or is delayed in fulfilling, any of its obligations under this Lease or because Landlord is unable to make, or is delayed in making, any repairs, additions, alterations, improvements or decorations or is unable to supply or is delayed in supplying any equipment or fixtures, if Landlord is prevented or delayed from so doing by reason of any of the following ("**Force Majeure Events**"):  fire or other casualty; acts of God; war; riot or other civil disturbance; accident; emergency; strike or other labor trouble; governmental preemption of priorities or other controls in connection with a national or other public emergency; difficulty in securing proper amounts of or failure or defect in the supply or quality of fuel, gas, steam, water, electricity, supplies or labor; or any other event or cause whatsoever beyond Landlord's reasonable control.

31.2    If, by reason of any Force Majeure Event, Tenant is unable to fulfill any of Tenant's obligations under this Lease (with the exception of any obligations on Tenant's part to pay any sum of money due Landlord, including, without limitation, the payment of Base Rent or Additional Charges, which monetary obligations shall remain unaffected by the provisions of this Section 31.2), Tenant shall not be required to

fulfill such non-monetary obligations during the period that Tenant is so prevented or delayed from so doing by reason of such Force Majeure Event.

## ARTICLE 32

## CONSENTS

32.1    If Tenant requests Landlord's consent and Landlord fails or refuses to give such consent, Tenant shall not be entitled to any damages for any withholding by Landlord of its consent.  Tenant's sole remedy for Landlord's refusal to give the requested consent shall be an action for specific performance or injunction.  Furthermore, Tenant shall be entitled to seek specific performance and/or an injunction only in those cases where this Lease provides that Landlord shall not unreasonably withhold its consent or where as a matter of law Landlord may not unreasonably withhold its consent.

## ARTICLE 33

## RENT CONTROL

33.1    If any Base Rent or Additional Charges shall become uncollectible, reduced or required to be refunded because of any Legal Requirements, Tenant shall enter into such agreements and take such other steps (without additional expense to Tenant) as Landlord reasonably requests and as may be legally permissible to permit Landlord to collect the maximum rents which from time to time during the continuance of such legal rent restriction may be legally permissible (but not in excess of the amounts reserved therefor under this Lease).  Upon the termination of such legal rent restriction, whether during the Term or after the Expiration Date, (a) Base Rent and Additional Charges shall be payable in accordance with the amounts reserved herein for the periods following such termination and (b) Tenant shall pay to Landlord, to the maximum extent

legally permissible, an amount equal to (i) the Base Rent and Additional Charges that would have been paid pursuant to this Lease but for such legal rent restriction, less (ii) the rent and additional rent actually paid by Tenant during the period such legal rent restriction was in effect.

## ARTICLE 34

## MISCELLANEOUS

34.1    Tenant expressly acknowledges and agrees that Landlord has not made and is not making, and Tenant, in executing and delivering this Lease, is not relying upon, any warranties, representations, promises or statements except to the extent that they are expressly set forth in this Lease.  All prior understandings and agreements between the parties are merged in this Lease, which alone fully and completely expresses the agreement of the parties and which are entered into after full investigation.

34.2    No agreement shall be effective to change, modify, waive, release, discharge, terminate or effect an abandonment of this Lease, in whole or in part, unless such agreement is in writing, refers expressly to this Lease and is signed by the party against whom enforcement of the change, modification, waiver, release, discharge, termination or effectuation of the abandonment is sought.

34.3    Except as otherwise expressly provided in this Lease, the obligations under this Lease shall bind and benefit the successors and assigns of the parties hereto with the same effect as if mentioned in each instance where a party is named or referred to; *provided*, *however*, that (a) no violation of the provisions of Article 8 shall operate to vest any rights in any successor or assignee of Tenant and (b) the provisions of this Section 34.3 shall not be construed as modifying the conditions

of limitation contained in Article 23.  No provision in this Lease shall be construed for the benefit of any third party except as expressly provided herein.

      34.4    Submission by Landlord of this Lease or other documents pertaining to the subject matter hereof for review and/or execution by Tenant shall not confer any rights or impose any obligations on either party unless and until both Landlord and Tenant execute this Lease and duplicate originals thereof are delivered to the respective parties.

      34.5    Irrespective of the place of execution or performance, this Lease shall be governed by and construed in accordance with the laws of the State of New York (without reference to its principles of conflicts of laws).  If any provision of this Lease or the application thereof to any person or circumstance, for any reason and to any extent, is invalid or unenforceable, the remainder of this Lease and the application of that provision to other persons or circumstances shall not be affected but rather shall be enforced to the extent permitted by law.  The table of contents, captions, headings and titles in this Lease are solely for convenience of reference and shall not affect its interpretation.  This Lease shall be construed without regard to any presumption or other rule requiring construction against the party causing this Lease to be drafted.  Each obligation of Tenant under this Lease shall be deemed and construed as a separate and independent covenant of Tenant, not dependent on any other provision of this Lease.  The terms and provisions of this Section 34.5 shall survive the expiration or termination of this Lease.

      34.6    All terms and words used in this Lease, regardless of the number or gender in which they are used, shall be deemed to include any other number and any other gender as the context may require.

34.7    This Lease may be executed in counterparts and shall constitute the agreement of Landlord and Tenant whether or not their signatures appear in a single copy hereof.

34.8    Tenant represents and warrants, as of the date hereof and throughout the Term, that:

(i)    it is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, nation, or transaction pursuant to any law, order, rule, or regulation that is enforced or administered by the Office of Foreign Assets Control; and

(ii)    it is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly of behalf of, any such person, group, entity or nation.

34.9    Tenant hereby agrees to defend, indemnify, and hold harmless Landlord from and against any and all claims, damages, losses, risks, liabilities, and expenses (including attorney's fees and costs) arising from or related to any breach of Section 34.8.  The terms and provisions of this Section 34.9 shall survive the expiration or termination of this Lease.

34.10   For the avoidance of doubt, Landlord and Tenant acknowledge that it is the intent of the parties that, so long as the Prior Lease is in full force and effect, if Tenant is required to obtain the consent or approval of Master Tenant with respect to any matter pursuant to the terms of the Prior Lease and Master Tenant grants such consent or

approval, Tenant shall not be required to separately obtain Landlord's consent or

approval of such matter pursuant to the terms of this Lease.

## ARTICLE 35

### SECURITY DEPOSIT

35.1    Tenant shall maintain in effect at all times during the term of this

Lease and through the period which is thirty (30) days following the Expiration Date, a

clean, unconditional and irrevocable letter of credit in a form reasonably satisfactory to

Landlord in the amount of Seven Hundred Fifty Thousand and 00/100 Dollars

($750,000.00) (the "**Security Deposit**"), subject to Section 35.2, issued by a bank that is

a member of the Clearinghouse Association ("**Bank**"), and presentable for payment at an

office of the Bank in the City of New York, New York, *provided* that, so long as the Prior

Lease is in full force and effect and the "Escrow Agent" (as defined in the Prior Lease) or

Master Tenant, as applicable, is in possession of the "Security Deposit" (as defined in the

Prior Lease) required under the terms of the Prior Lease, the requirements of this Lease

with respect to the Security Deposit shall be deemed satisfied.  Such letter of credit shall

have an expiration date no earlier than the first anniversary of the date of issuance thereof

and it shall be automatically renewed from year-to-year unless terminated by the Bank by

notice to Landlord (or, so long as the Prior Lease is full force and effect, to Master

Tenant) given not less than sixty (60) days prior to the then expiration date therefor.

Tenant acknowledges and agrees that, as more particularly set forth in that certain

Agreement (Security Deposit), dated as of the Effective Date, between Landlord and

Tenant (the "**Security Deposit Agreement**"), a copy of which is attached hereto as

Exhibit F, upon the expiration or earlier termination of the Master Lease, Tenant shall

direct Master Tenant to deliver the "Security Deposit" (as defined in the Prior Lease) to Landlord to be held as the Security Deposit under this Lease. Upon delivery of the re-issued letter of credit (naming Landlord as the beneficiary thereunder), if the Prior Lease Commencement Date has not theretofore occurred, the "Escrow Agent" (as defined in the Security Deposit Agreement) shall hold the "Security Deposit" (as defined in the Prior Lease) in accordance with the terms of the Security Deposit Agreement as the Security Deposit under this Lease until the delivery of the Security Deposit to Landlord or Tenant, as applicable, in accordance with the Security Deposit Agreement, in which case, the terms and provisions of the Prior Lease shall be incorporated into this Lease, and shall govern the respective rights and obligations of Landlord and Tenant with respect to the Security Deposit so held by the Escrow Agent, in each case as set forth in the Security Deposit Agreement.

35.2    It is agreed that, in the event Tenant defaults in respect of any of the terms, covenants or provisions of this Lease, including, but not limited to, the payment of any Base Rent or Additional Charges, and such default continues beyond the applicable grace or cure period, if any, or if the Bank gives notice of termination or non-renewal of any letter of credit, and such letter of credit is not replaced at least twenty (20) days prior to its termination or expiration, or if any letter of credit terminates or expires by its terms, and such letter of credit is not replaced at least twenty (20) days prior to its termination or expiration, then, from and after the Master Lease End Date (it being understood that, until the Master Lease End Date, all such rights and remedies may be exercised by Master Tenant pursuant to the Prior Lease) (i) Landlord shall have the right to require the Bank to make payment to Landlord of so much of the entire proceeds of the

letter of credit as shall be reasonably necessary to cure the default (or the entire proceeds

if notice of termination or non-renewal is given or the letter of credit terminates or

expires by its terms as aforesaid and the letter of credit is not replaced as aforesaid), and

(ii) Landlord may apply said sum so paid to it by the Bank to the extent required for the

payment of any rent or any other sum as to which Tenant is in default beyond applicable

grace and cure periods or for any sum which Landlord may expend or may be required to

expend by reason of Tenant's default beyond applicable grace and cure periods in respect

of any of the terms, covenants and conditions of this Lease, including, but not limited to,

any damages or deficiency in the reletting of the Premises, whether such damages or

deficiency accrues before or after summary proceedings or other re-entry by Landlord,

without thereby waiving any other rights or remedies of Landlord with respect to such

default.  If Landlord applies any part of the proceeds of a letter of credit, Tenant, upon

demand, shall deposit with Landlord promptly the amount so applied or retained (or

increase the amount of the letter of credit) so that the Landlord shall have the full deposit

on hand at all times during the Term.  If, subsequent to a letter of credit being drawn

upon for any reason other than default of Tenant under this Lease, a new letter of credit

meeting all the requirements set forth in this Article 35 is delivered to Landlord, any

proceeds of the former letter of credit then held by Landlord shall be promptly returned to

Tenant.  If a letter of credit is drawn upon, any proceeds received by Landlord which are

not applied to the curing of the default shall be held in an interest-bearing account in a

bank located in New York City.  Landlord shall provide Tenant notice as to the location

of such account and shall pay to Tenant on request (*provided* that no default then exists

hereunder), but not more frequently than annually, the interest on such account less the

1% administrative fee allowed by law, which fee may be retained by Landlord.  Tenant

further covenants that it will not assign or encumber or attempt to assign or encumber the

security and that neither Landlord nor its successors or assigns shall be bound by any

such assignment, encumbrance, attempted assignment or attempted encumbrance.  If

Tenant shall fully and faithfully comply with all of the terms, covenants and provisions of

this Lease, any letter of credit, or any remaining portion of any sum collected by

Landlord thereunder from the Bank, together with any other portion or sum held by

Landlord as security shall be returned to Tenant within thirty (30) days after the

Expiration Date of this Lease and after delivery of the entire possession of the Premises

to Landlord.  In the event of an assignment by Landlord of its interest under this Lease,

Landlord shall transfer the security to the assignee and Landlord shall thereupon be

released by Tenant from all liability for the return of such security, and from and after

such transfer Tenant agrees to look to the new Landlord solely for the return of said

security and it is agreed that the provisions hereof shall apply to every transfer or

assignment made of the security to a new Landlord.

      35.3    Upon the earlier of: (i) the reduction of the amount of the "Security

Deposit" (as defined in the Prior Lease) pursuant to Section 35.3 of the Prior Lease, and

(ii) Tenant's paying the first year's Base Rent (*provided* that if, at such time, any

monetary default or material non-monetary default shall have occurred and be continuing,

then at such later time as no monetary default and no material non-monetary default shall

be continuing), the amount of the Security Deposit shall be reduced to Four Hundred

Thousand and 00/100 Dollars ($400,000.00).

35.4    Tenant shall have the right to substitute one letter of credit for another, *provided* that at all times the letter of credit shall meet the requirements of this Article 35.

35.5    The terms and provisions of this Article 35 shall survive the expiration or termination of this Lease.

35.6    Tenant agree that it shall not agree to any amendment, restatement or other modification of Article 35 of the Prior Lease, in each case, without the prior written consent of Landlord.

IN WITNESS WHEREOF, Landlord and Tenant have duly executed this

Lease as of the day and year first above written.

**Landlord**:

EBNB 70 PINE OWNER LLC

By:    Antique Pine Rose, LLC, its Manager

By: _____

Name:   Adam R. Rose

Title:   Manager

*[Signatures Continued on Following Page]*

*[Landlord Signature Page to New Lease]*

**Tenant**:

DOWN TOWN ASSOCIATION

By: _____
     Name:  Mark Altherr
     Title:   President

By: _____
     Name:  Timothy L. Thompson
     Title:   Secretary

Tenant's Federal Tax Identification Number:
13-5035020

*[Tenant Signature Page to New Lease]*

**Tenant**:

DOWN TOWN ASSOCIATION

By: _____
    Name:  Mark Altherr
    Title:    President

By: _____
    Name:  Timothy L. Thompson
    Title:    Secretary

Tenant's Federal Tax Identification Number:
13-5035020

*[Tenant Signature Page to New Lease]*





EXHIBIT B

COMMENCEMENT DATE AGREEMENT

AGREEMENT dated this ___ day of _____, 20__ by and between EBNB 70 PINE OWNER LLC, a Delaware limited liability company, having its principal office at c/o Rose Associates, 200 Madison Avenue, New York, NY 10016 and DOWN TOWN ASSOCIATION, a New York not-for-profit corporation, having an office at 60 Pine Street, New York, NY 10005.

W I T N E S S E T H :

1. The parties have heretofore entered into a Lease dated as of December ___, 2014 (the "**Lease**") for the leasing by Landlord to Tenant of certain portions of the first (1st) and second (2nd) floors of the building known as 70 Pine Street, New York, New York, consisting of the "Downtown Unit" in the 70 Pine Street Condominium, all as more particularly described in the Lease.

2. Landlord and Tenant hereby agree that the Commencement Date (as defined in the Lease) is _____, 20__.

IN WITNESS WHEREOF, Landlord and Tenant have each duly executed this agreement as of the day and year first above written.

Landlord:

EBNB 70 PINE OWNER LLC


By:    Antique Pine Rose, LLC, its Manager

By: _____
Name:
Title:


Tenant:

DOWN TOWN ASSOCIATION


By: _____
Name:
Title:

By: _____
Name:
Title:

EXHIBIT C

PLANS AND SPECIFICATIONS FOR LANDLORD'S WORK

Landlord's Work will include all rooms and layouts shown on the plan of March 7, 2013 (attached as Exhibit A to the Lease), as may be modified pursuant to the Lease, and all items listed on the attached January 29, 2013 list by Stephen B Jacobs Group PC, as supplemented and/or modified by the following:

1. All electric outlets and phone and cable jacks in compliance with applicable Legal Requirements and consistent with the residential rental portion of the Building. Locations of such electric outlets and phone and cable jacks to be determined by Landlord's final plans and such locations to be subject to the reasonable approval by Tenant.

2. 2 additional outlets at each bed wall and desk area.

3. All tubs to be 6'0" (instead of 5').

4. 4 (instead of 3) board layers of gypsum on the demising walls.

5. Master on/off switch.

6. Carpet (of equivalent value) instead of engineered wood floor.

7. Paint with wall covering accents (of equivalent value), as heretofore agreed by Landlord and Tenant, instead of paint.

8. Two toilets and two sinks and one utility sink to be provided in the hotel service area.

9. Sprinklers required under applicable Legal Requirements to be concealed within the ceilings.

EXHIBIT D

BASE RENT

1.  <u>Base Rent</u>.  Base Rent shall be paid in the following amounts, in advance, in accordance with the provisions of this Lease (including, without limitation, <u>Section 1.3</u> and <u>Section 1.4</u>), and subject to <u>Section 8.12</u> and <u>Section 1.2(h)(i)</u> and <u>Section 1.2(h)(ii)</u>, if applicable (for the avoidance of doubt, it being understood that Base Rent shall be payable under this Lease only for the period from and after the Commencement Date and only such portions of the below schedule of Base Rent shall be applicable as pertain to the time period during the Term):

   (a)    For the period from and after the Prior Lease Commencement Date through and including the day immediately preceding the one (1) year anniversary thereof, Seven Hundred Fifty Thousand and 00/100 Dollars ($750,000.00) per annum (subject to increase pursuant to <u>Paragraph 2</u> of this <u>Exhibit D</u>, if applicable);

   (b)    For the period commencing on the one (1) year anniversary of the Prior Lease Commencement Date through and including the day immediately prior to the two (2) year anniversary of the Prior Lease Commencement Date, Eight Hundred Ninety-Two Thousand and 00/100 Dollars ($892,000.00) per annum (subject to increase pursuant to <u>Paragraph 2</u> of this <u>Exhibit D</u>, if applicable);

   (c)    For each successive twelve (12)-month period commencing on the two (2) year anniversary of the Prior Lease Commencement Date, through and including the day immediately preceding the twenty (20) year anniversary of the Prior Lease Commencement Date, an annual amount equal to one hundred two percent (102%) of the annual Base Rent payable during the immediately preceding twelve (12)-month period (subject to increase pursuant to <u>Paragraph 2</u> of this <u>Exhibit D</u>, if applicable);

   (d)    For the period commencing on the twenty (20) year anniversary of the Prior Lease Commencement Date through and including the day immediately preceding the twenty-one (21) year anniversary of the Prior Lease Commencement Date, an annual amount (the "**First Reset Rent**") equal to the greater of (i) one hundred two percent (102%) of the annual Base Rent payable during the immediately preceding twelve (12)-month period and (ii) the First Base Rent Reset Amount;

   (e)    For each successive twelve (12) month period commencing on the twenty-one (21) year anniversary of the Prior Lease Commencement Date through and including the day immediately preceding the forty (40) year anniversary of the Prior Lease Commencement Date (an annual amount

equal to the one hundred two percent (102%) of the annual Base Rent payable during the immediately preceding twelve (12)-month period;

(f) For the period commencing on the forty (40) year anniversary of the Prior Lease Commencement Date through and including the day immediately preceding the forty-one (41) year anniversary of the Prior Lease Commencement Date, an annual amount (the "**Second Reset Rent**") equal to the greater of (i) one hundred two percent (102%) of the annual Base Rent payable during the immediately preceding twelve (12)-month period and (ii) the Second Base Rent Reset Amount;

(g) For each successive twelve (12)-month period commencing on the forty-one (41) year anniversary of the Prior Lease Commencement Date through and including the day immediately preceding the Expiration Date, an annual amount equal to one hundred two percent (102%) of the annual Base Rent payable during the immediately preceding twelve (12)-month period.

At any time after the Base Rent amount has been determined pursuant to the terms of this Lease for a particular year, Tenant shall, within ten (10) days after Landlord's request therefor, execute a written agreement confirming such Base Rent amount. Any failure on Tenant's part to execute such written agreement shall not affect the validity of the amount of Base Rent as fixed and determined pursuant to the terms of this Lease.

2. ICAP. To the extent (if any) that the Industrial and Commercial Abatement Program ("**ICAP**") does not provide abatements of real estate taxes for the Premises at least equal to $180,297 per tax year in any tax year from and after the 2014-15 tax year through and including the 2025-26 tax year for any reason (including, without limitation, because the Property failed to qualify for ICAP), then the annual Base Rent payable with respect to such tax year shall be increased by such abatement shortfall in such tax year, *provided* that Landlord or Master Tenant has made a timely and proper application for ICAP and such application has been denied. The provisions of this Paragraph 2 shall not be taken into account when applying the one hundred two percent (102%) calculation set forth in subparagraph 1(c).

3. Base Rent Reset Determination. The following terms shall have the respective meanings set forth below:

(a) "**Fair Market Rent of the Premises**" shall mean the annual base rent that a willing tenant would pay a willing landlord (in an arms-length transaction) for the Premises as used, open and operated for the uses set forth in Article 2 of this Lease (for the avoidance of doubt, taking into account that the term 'Eligible Guest' includes hotel guests of a qualifying hotel operator if the Lease has been assigned, or the Premises have been subleased, to such qualifying hotel operator in accordance with the terms of this Lease, as set forth in the second sentence of Section 1.8(e)). For

the purpose of determining the Fair Market Rent of the Premises, (i) the Premises shall be assumed to be in first-class condition and in full compliance with this Lease, (ii) the terms and conditions of this Lease shall be taken into account (including, without limitation, that Tenant is paying no escalations or other amounts with respect to real estate taxes or operating expenses) and (iii) all other relevant factors shall be taken into account.

(b)   **"First Base Rent Reset Amount"** shall mean the Fair Market Rent of the Premises computed as of the date that is six (6) months prior to the twenty (20) year anniversary of the Commencement Date.

(c)   **"Second Base Rent Reset Amount"** shall mean the Fair Market Rent of the Premises computed as of the date that is six (6) months prior to the forty (40) year anniversary of the Commencement Date.

4.   <u>Procedure for Determining Base Rent</u>. The First Reset Rent and Second Reset Rent shall be determined by Landlord and announced in a notice (the "**Rental Notice**") delivered to Tenant by Landlord not later than one hundred fifty (150) days prior to the first (1ˢᵗ) day of the period during which such reset Base Rent would apply (such period, the "**Base Rent Adjustment Period**"); *provided*, *however*, that if Tenant shall dispute Landlord's determination by notice delivered to Landlord (the "**Notice of Dispute**") not later than thirty (30) days after delivery to Tenant of the applicable Rental Notice (or twenty (20) days after the reminder notice below, as applicable), then the Base Rent shall be determined by the appraisal and arbitration procedure set forth in <u>Paragraph 5</u> below. If Tenant shall not deliver a Notice of Dispute to Landlord within twenty (20) days after Tenant's receipt of the applicable Rental Notice, then (at any time thereafter, until the date, if any, on which Tenant shall deliver a Notice of Dispute relating to such Rental Notice) Landlord shall have the right to submit a reminder notice to Tenant, which reminder notice shall enclose a copy of the applicable Rental Notice previously delivered to Tenant and shall also include in bold and capitalized letters on the first page of such notice: "THIS NOTICE IS BEING GIVEN UNDER EXHIBIT D OF THE LEASE FOR THE PREMISES AT 70 PINE STREET, NEW YORK, NEW YORK. YOUR FAILURE TO RESPOND WITHIN TWENTY (20) DAYS WILL RESULT IN YOUR BEING DEEMED TO HAVE ACCEPTED LANDLORD'S DETERMINATION OF BASE RENT FOR A BASE RENT ADJUSTMENT PERIOD" and, if Tenant shall fail to deliver such Notice of Dispute to Landlord within twenty (20) days after Tenant's receipt of such reminder notice, then Tenant shall be deemed to have accepted Landlord's determination of the Base Rent (as set forth in the applicable Rental Notice) for the relevant Base Rent Adjustment Period. Tenant shall have no right to dispute Landlord's determination of the Base Rent for the relevant Base Rent Adjustment Period if Landlord has determined that the Base Rent for the Base Rent Adjustment Period shall equal one hundred two percent (102%) of the Base Rent payable during the twelve (12) month period immediately preceding such Base Rent Adjustment Period, rather than the First Base Rent Reset Amount or the Second Base

Rent Reset Amount, as the case may be.  If Landlord shall fail to determine the Base Rent as set forth above, either party shall have the right to have the Base Rent determined by the appraisal and arbitration procedure set forth in Paragraph 5 below, it being agreed that the failure of Landlord to deliver the Rental Notice for any Base Rent Adjustment Period within the time period provided above shall not be deemed a waiver of Landlord's right to deliver a Rental Notice for any subsequent Base Rent Adjustment Period, or a waiver of either party's right to have the Base Rent for that Base Rent Adjustment Period determined pursuant to the appraisal and arbitration procedure set forth in Paragraph 5 below, except as hereinafter provided.  If Landlord shall fail to designate the Base Rent for any Base Rent Adjustment Period as set forth above and neither party shall have exercised its right to have the Base Rent for such Base Rent Adjustment Period determined by the appraisal and arbitration procedure set forth in Paragraph 5 below, then the Base Rent for such Base Rent Adjustment Period shall be equal to one hundred two percent (102%) of the Base Rent payable during the twelve (12) month period immediately preceding such Base Rent Adjustment Period (escalating thereafter pursuant to Paragraph 1 of this Exhibit D, as applicable) until such time as Landlord shall deliver an Appraisal and Arbitration Notice on account of such Base Rent Adjustment Period, whereupon the Base Rent for such Base Rent Adjustment Period shall be determined by the appraisal and arbitration procedure set forth in Paragraph 5 below as of the commencement of the applicable Base Rent Adjustment Period and, upon such determination of the Base Rent for the relevant Base Rent Adjustment Period, Tenant shall pay to Landlord within fifteen (15) Business Days following such determination, any underpayment of Base Rent since the commencement of the relevant Base Rent Adjustment Period, *provided*, *however*, that such amounts shall bear interest at the Default Rate from the date that fifteen (15) Business Days after the date of such determination.  Notwithstanding the foregoing, if Landlord shall fail to deliver a Rental Notice for any Base Rent Adjustment Period prior to the commencement of such Base Rent Adjustment Period, then (at any time thereafter, until the date, if any, that Landlord shall deliver an Appraisal and Arbitration Notice for such Base Rent Adjustment Period) Tenant shall have the right to submit a notice to Landlord, which notice shall include in bold and capitalized letters on the first page thereof: "THIS NOTICE IS BEING GIVEN UNDER EXHIBIT D OF THE LEASE FOR THE PREMISES AT 70 PINE STREET, NEW YORK, NEW YORK.  YOUR FAILURE TO RESPOND WITHIN THIRTY (30) DAYS WILL RESULT IN THE DETERMINATION OF BASE RENT FOR A BASE RENT ADJUSTMENT PERIOD" and, if Landlord shall fail to deliver an Appraisal and Arbitration Notice within thirty (30) days after Landlord's receipt of such notice from Tenant, the Base Rent for such Base Rent Adjustment Period shall be definitively set to be equal to one hundred two percent (102%) of the Base Rent payable during the twelve (12) month period immediately preceding such Base Rent Adjustment Period (escalating thereafter pursuant to Paragraph 1 of this Exhibit D, as applicable).  Notwithstanding anything in this Exhibit D to the contrary, if prior to the Master Lease End Date, the "First Reset Rent" (as defined in the Prior Lease) and/or the "Second Reset Rent" (as defined in the Prior Lease) shall have been determined pursuant to the terms of the Prior Lease, the term "First Reset Rent" for the purposes of this Lease shall mean the "First Reset

Rent" (as defined in the Prior Lease) and the term "Second Reset Rent" for the purposes of this Lease shall mean the "Second Reset Rent" (as defined in the Prior Lease), in each case, as so determined pursuant to the Prior Lease

5. <u>Appraisal and Arbitration</u>. Any dispute between Landlord and Tenant as to the Base Rent for a Base Rent Adjustment Period shall be determined in accordance with the following provisions:

(a) On or after the delivery of the Notice of Dispute or following Landlord's failure to designate the Base Rent by delivery of a Rental Notice within the applicable time period provided in <u>Paragraph 4</u> above, either Landlord or Tenant may notify the other party in writing that it desires to meet to attempt to agree on the Base Rent. Each party shall be entitled to have its consultants and experts participate in the meetings and discussions between the parties. If Landlord and Tenant have not agreed on the Base Rent for a Base Rent Adjustment Period and executed and delivered between them a supplement to this Lease setting forth such determination on or prior to the ninetieth (90th) day preceding the first day of the applicable Base Rent Adjustment Period, then either Landlord or Tenant may notify the other that it desires to invoke the appraisal and arbitration procedure set forth in this <u>Paragraph 5</u>.

(b) If Landlord or Tenant desire to invoke the appraisal and arbitration procedure set forth in this <u>Paragraph 5</u>, the party invoking the appraisal and arbitration procedure shall give a notice (an "**Appraisal and Arbitration Notice**") to the other party meeting the requirements of Section 7503(c) of the New York State Civil Practice Law and Rules ("**CPLR**"), or any successor section or statute, and specifying in said notice the name and address of the person designated to act as an appraiser on its behalf. Within fifteen (15) days after the service of an Appraisal and Arbitration Notice, the other party shall give written notice to the first party specifying the name and address of the person designated to act as an appraiser on its behalf. If the second party fails to notify the first party of the appointment of its appraiser, as aforesaid, within the time above specified, then the appointment of the second appraiser shall be made by the American Arbitration Association ("**AAA**") or any successor thereto in accordance with its rules then prevailing, or by the Court, in the same manner as hereinafter provided for the appointment of an arbitrator in a case where the two appraisers appointed hereunder and the parties are unable to agree upon such appointment. Each appraiser so chosen by the parties shall be a competent person, shall not be affiliated with Landlord or Tenant and shall be an MAI (or a member of any successor organization) appraiser with at least ten (10) years of experience in the determination of fair market rents for commercial properties in the Borough of Manhattan (which experience shall include at least two (2) instances of determining the fair market value of hotel properties). The

two appraisers shall meet within ten (10) days after the second appraiser is appointed and if, within twenty (20) days after the second appraiser is appointed, the two appraisers shall not agree upon the Fair Market Value of the Premises, they shall themselves appoint an arbitrator who shall be a competent and impartial person having the qualifications described in subsection (c)(ii) of this Paragraph 5, utilizing the following procedure: (i) each appraiser shall prepare and provide to the other a list of three (3) acceptable arbitrators no later than twenty-five (25) days after the second appraiser is appointed; (ii) if one or more names appear on both initial lists, then the two appraisers shall select from among such names or in the event of their being unable to agree, then the appraiser appointed by Landlord shall select from among the names appearing on both lists to serve as arbitrator hereunder; if there is no match among the initial list of six (6) names and the two (2) appraisers shall be unable to agree upon one (1) of the six (6) names to serve as arbitrator hereunder within a period of two (2) Business Days following such delivery, then each appraiser shall prepare and provide to the other a second list of three (3) acceptable arbitrators not later than one (1) Business Day thereafter, with the process of selecting first from among any matching names and then from among any of the twelve (12) names appearing on both lists, to be governed by the rules for the first six (6) such names, as aforesaid. If the two (2) appraisers are unable to agree upon such appointment within thirty (30) days after the second appraiser is appointed, the arbitrator shall be selected by the parties themselves if they can agree thereon within a further period of fifteen (15) days. If the parties do not so agree, then either party, on behalf of both and on notice to the other, may request such appointment by the Commercial Real Estate Valuation Panel of the AAA or any successor thereto in accordance with its rules then prevailing or if the AAA shall fail to appoint said arbitrator within fifteen (15) days after such request is made or if the AAA shall fail to exist, then either party may apply, on notice to the other, to the Supreme Court in the County of New York (or any successor court of general jurisdiction in such County, the "**Court**") for the appointment of such arbitrator, and the other party shall not (and expressly waives any right to) raise any question as to the Court's full power and jurisdiction to entertain the application and make the appointment. The date on which the arbitrator is appointed, whether by the agreement of the appraisers or parties, by appointment by the AAA or by appointment by the Court, is referred to herein as the "**Appointment Date**." If any appraiser or arbitrator appointed hereunder shall be unwilling or unable, for any reason, to serve, or continue to serve, a replacement appraiser or arbitrator, as applicable, shall be appointed in the same manner as provided herein for the initial appointment of such appraiser or arbitrator.

(c)     The arbitration shall be conducted in accordance with the then prevailing rules of the AAA, but to the extent (if any) that that New York law

imposes requirements different than those of the AAA in order for the decision of the arbitrator to be enforceable in the courts of the State of New York, such requirements shall be complied with in the arbitration.

(d)     The arbitrator shall not be affiliated with Landlord or Tenant and shall be an MAI (or a member of any successor organization) appraiser with at least ten (10) years of experience in the determination of fair market rents of commercial properties in the Borough of Manhattan (which experience shall include at least two (2) instances of determining the fair market value of hotel properties).

(e)     Before hearing any testimony or receiving any evidence, the arbitrator shall be sworn or affirmed to hear and decide the controversy faithfully and fairly by an officer authorized to administer an oath or affirmation and a written copy thereof shall be delivered to Landlord and Tenant.

(f)     Within ten (10) days after the Appointment Date, Landlord and Tenant shall deliver to the arbitrator three (3) copies of their respective written determinations of the Base Rent for the relevant Base Rent Adjustment Period (each, a "**Determination**"), together with such affidavits, appraisals, reports and other written evidence relating thereto as the submitting party deems appropriate. Neither Landlord nor Tenant shall be bound by any prior statements of writings, including, without limitation, the Rental Notice, any prior appraisal, and/or any prior correspondence or dealings with reference to its determination of the Base Rent set forth in the Determinations, it being agreed that the Base Rent set forth for the relevant Base Rent Adjustment Period in Landlord's Determination may be higher or lower than the Base Rent set forth therefor in the Rental Notice, any appraisal or any prior correspondence or discussions. After the submission of any Determination, the submitting party may not make any additions to or deletions from, or otherwise change, such Determination or the affidavits, appraisals, reports and other written evidence delivered therewith. The arbitrator shall, promptly after receipt of the second Determination, deliver a copy of each party's Determination to the other party. If either party fails to so deliver its Determination within five (5) days after the Appointment Date, then (at any time prior to the earlier to occur of (x) the date which is ten (10) days after the Appointment Date and (y) the date on which such failing party shall so deliver such Determination) the other party shall have the right to submit a reminder notice to the failing party (with a copy to the arbitrator), which reminder notice shall include in bold and capitalized letters on the first page thereof: "THIS NOTICE IS BEING GIVEN UNDER EXHIBIT D OF THE LEASE FOR THE PREMISES AT 70 PINE STREET, NEW YORK, NEW YORK. YOUR FAILURE TO RESPOND BY THE DATE THAT IS TEN (10) DAYS AFTER THE APPOINTMENT DATE WILL RESULT IN THE DETERMINATION OF BASE RENT FOR A BASE

RENT ADJUSTMENT PERIOD" and, if the failing party shall continue to fail to deliver its Determination on or before the date that is ten (10) days after the Appointment Date, time being of the essence with respect thereto, such failing party shall be deemed to have irrevocably waived its right to deliver a Determination and the arbitrator, without holding a hearing, shall accept the Determination of the submitting party as the Base Rent for the relevant Base Rent Adjustment Period.

(g)    If the Base Rent for the relevant Base Rent Adjustment Period has not been determined pursuant to subsection (f) above, then not less than fifteen (15) days nor more than thirty (30) days after the earlier to occur of (A) the expiration of the ten (10) day period provided for in subsection (f) above or (B) the arbitrator's receipt of both of the Determinations from the parties (such earlier date is referred to herein as the "**Submission Date**"), and upon not less than ten (10) days' notice to the parties, the arbitrator shall hold one or more hearings with respect to the determination of the Base Rent for the relevant Base Rent Adjustment Period.  The hearings shall be held in the Borough of Manhattan at such location and time as shall be specified by the arbitrator.  Each of the parties and the designated appraisers shall be entitled to present all relevant evidence and to cross-examine witnesses at the hearings.  The arbitrator shall have the authority to adjourn any hearing to such later date as the arbitrator shall specify, *provided* that, in all events, all hearings with respect to the determination of the Base Rent for the relevant Base Rent Adjustment Period shall be concluded not later than forty-five (45) days after the Submission Date.

(h)    Except as otherwise provided in subsection (f) above, the arbitrator shall be instructed, and shall be empowered only to determine the Base Rent for the relevant Base Rent Adjustment Period by selecting either Landlord's Determination or Tenant's Determination in its entirety, in either event, without any modification thereto.

(i)    The arbitrator shall render a decision as to the Base Rent for the relevant Base Rent Adjustment Period in a signed and acknowledged written instrument, original counterparts of which shall be sent simultaneously to Landlord and Tenant, within ten (10) days after the earlier to occur of (A) the arbitrator's determination of the Base Rent for the relevant Base Rent Adjustment Period pursuant to subsection (f) above or (B) the conclusion of the hearing(s) required by subsection (g) above.

(j)    This provision shall constitute a written agreement to submit any dispute regarding the determination of Base Rent for the relevant Base Rent Adjustment Period to arbitration.

(k)    The arbitration decision, determined as provided in this Paragraph 5, shall be conclusive and binding on the parties, shall constitute an "award" by

the arbitrator within the meaning of the AAA rules and applicable law and judgment may be entered thereon in any court of competent jurisdiction.

(l)    Each party shall pay its own fees and expenses relating to the arbitration under this Paragraph 5 (including, without limitation, the fees and expenses of the one of the two appraisers appointed by or for such party, of its counsel and of experts and witnesses retained or called by it). Each party shall pay one-half (½) of the fees and expenses of the AAA and of the arbitrator; *provided, however,* that if either party is deemed to have waived its right to submit a Determination, such non-submitting party shall pay all of the fees and expenses of the arbitration.

6.    Base Rent Prior to Determination. If arbitration concerning the Base Rent pursuant to Paragraph 5 of this Exhibit D shall not be concluded prior to the commencement of the relevant Base Rent Adjustment Period, Tenant shall pay to Landlord, as Base Rent for the period in dispute, an amount equal to one hundred two percent (102%) of the Base Rent payable during the twelve (12) month period immediately preceding such Base Rent Adjustment Period, from and after the commencement of the relevant Base Rent Adjustment Period until a determination is made by the arbitrator under Paragraph 5 of this Exhibit D and, upon such determination of the Base Rent for the relevant Base Rent Adjustment Period, Landlord or Tenant, as the case may be, shall promptly pay to the other party hereto, within thirty (30) days following notice of such determination, any underpayment or overpayment of Base Rent by such party since the beginning of the relevant Base Rent Adjustment Period together with interest on the amounts of such underpayment or overpayment at the Prime Rate plus two hundred (200) basis points (or, if lower, the maximum rate allowed by law), from the commencement of the relevant Base Rent Adjustment Period until fully paid; *provided* that such amounts shall bear interest at the Lease Interest Rate from the date that is ten (10) Business Days after written demand for payment until paid by the non-prevailing party to the other party.

EXHIBIT E

FORM OF CONDOMINIUM SNDA

---

**SUBORDINATION, NON-DISTURBANCE
AND ATTORNMENT AGREEMENT**

---

Dated:          December ___, 2014

Premises:       Portions of the 1st and 2nd floors of the building located
                at 70 Pine Street, New York, New York, which
                premises consist of the "Downtown Unit" in the 70
                Pine Street Condominium

Section:
Block:          41
Lot:            1303
County:         New York

PREPARED BY AND UPON
RECORDATION RETURN TO:

          Curtis, Mallet-Provost, Colt & Mosle LLP
          101 Park Avenue
          New York, NY 10178
          Attention: Martin Forman, Esq.

THIS SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT (this "**Agreement**") dated as of the ___ day of December, 2014 (the "**Effective Date**"), among 70 PINE STREET CONDOMINIUM, a condominium formed pursuant to Article 9-B of the Real Property Law of the State of New York, having an address at c/o Rose Associates LLC, 200 Madison Avenue, New York, NY 10016 ("**Condominium**"), EBNB 70 PINE OWNER LLC, a Delaware limited liability company having an address at c/o Rose Associates LLC, 200 Madison Avenue, New York, NY 10016 ("**Unit Owner**") and DOWN TOWN ASSOCIATION, a New York not-for-profit corporation having an address at 60 Pine Street, New York, NY 10005 ("**Tenant**").

WITNESSETH:

WHEREAS, pursuant to that certain Declaration of 70 Pine Street Condominium dated as of January 24, 2013 (as amended from time to time, and including the by-laws thereunder as in effect from time to time, the "**Declaration**"), that certain land and building located at 70 Pine Street, New York, New York (such land and building, collectively, the "**Property**"), which Property is more particularly described on Exhibit A attached hereto and made a part hereof, have been submitted to a condominium structure and the Condominium has been established; and

WHEREAS, Unit Owner and Tenant have entered into a Lease dated as of the Effective Date (the "**Lease**"), whereby Unit Owner will lease to Tenant certain premises located on the 1st and 2nd floors of the Property (such premises, the "**Leased Premises**") comprised of the condominium unit known as the "Downtown Unit" (such condominium unit, the "**Unit**"); and

WHEREAS, references in this Agreement to the Condominium shall be deemed (where applicable) to include its successors, assigns and designees (including, without limitation, any purchaser of the Unit at a foreclosure sale under the Declaration or in a deed-in-lieu of foreclosure under the Declaration).

NOW, THEREFORE, in consideration of the covenants and agreements set forth herein, the parties hereto agree as follows:

1.    All terms used in this Agreement which are defined in the Declaration shall have the respective meanings set forth in the Declaration, unless any such term or terms are defined otherwise in this Agreement.

2.    Condominium agrees that so long as no event of default then exists under the Lease which would permit Unit Owner to terminate the Lease or to exercise any dispossessory remedy provided for in the Lease:

(a)    Tenant shall not be named or joined as a party defendant in any action, suit or proceeding which may be instituted or taken by Condominium to enforce the performance or observance by Unit Owner of the provisions of the

Declaration and/or to recover damages for breach thereof by reason of the occurrence of any default under the Declaration;

(b)    Tenant shall not be evicted from the Leased Premises, nor shall the Lease be cut off or terminated, nor shall Tenant's possession under the Lease be disturbed in or as a result of any such action, suit or proceeding; and

(c)    In the event that the Condominium shall foreclose on the Unit or otherwise succeed to the rights of Unit Owner as owner thereof, as a result of any default under the Declaration, Condominium shall recognize the rights of Tenant under the Lease (pursuant to the terms of this Agreement).

3.    If at any time the Condominium shall foreclose on the Unit or otherwise succeed to the rights of Unit Owner as owner thereof, as a result of any default under the Declaration, and if no event of default under the Lease then exists which would permit Unit Owner to terminate the Lease or to exercise any dispossessory remedy provided for in the Lease, then: (a) the Lease shall not terminate, (b) Tenant shall retroactively to the date of such foreclosure or other succession attorn to and recognize Condominium as Tenant's landlord under the Lease, and (c) Condominium shall accept such attornment and recognize Tenant as the tenant under the Lease. Upon such attornment and recognition, each of which shall be self-operative except as hereinafter specifically provided in this Paragraph 3, the Lease shall continue in full force and effect as, or as if it were, a direct lease between Condominium and Tenant upon all of the then executory terms, conditions and covenants (including, without limitation, any remedies expressly set forth in the Lease in the event of a delay of the commencement date thereof) as are set forth in the Lease and which shall be applicable after such attornment. Notwithstanding the foregoing, unless Unit Owner controls Condominium or Unit Owner and Condominium are under common control, from and after the Commencement Date, Condominium shall not be (i) liable for any previous act or omission of Landlord under the Lease, (ii) subject to any offsets or defenses, not expressly provided in the Lease, which theretofore accrued to the Tenant against Landlord, (iii) liable for any security deposited by Tenant which has not been transferred to Condominium, (iv) bound by any previous prepayment of more than one month's rent, (v) bound by any covenant to undertake or complete any construction of the Leased Premises or any portion thereof demised by the Lease, (vi) bound by any obligation to make any payment to, or on behalf of, the Tenant or provide any services or perform any repairs, maintenance or restoration provided for under this Lease to be performed before the date that such holder succeeded to the interest of Landlord under the Lease or bound by any obligation to make any payment to Tenant with respect to construction performed by, or on behalf of, Tenant at the Leased Premises, and (vii) bound by any obligation to repair, replace, rebuild or restore the Leased Premises in the event of damage by fire or other casualty, or in the event of partial condemnation, in any such case in excess of the insurance proceeds or condemnation award actually collected by Condominium; *provided*, *however*, that (notwithstanding the provisions of this sentence) Condominium shall be responsible for any remedies expressly set forth in the Lease in the event of a delay of the commencement date thereof, to the extent (if any) that the same are applicable and not

12

yet been performed by Landlord. For the purposes of this Agreement, the term "**control**" shall mean, (i) the ownership of not less than fifty one percent (51%) of all of the legal and equitable interest in a business entity, or (ii) the power to direct or cause the direction of the management and policies of a business entity, whether through the ownership of such entity, by contract or otherwise.

4.    Tenant and Condominium shall promptly execute and deliver any reasonable instrument, in recordable form and in form satisfactory to both Tenant and Condominium, that either may request to evidence such attornment and recognition; but the failure of the parties to do so shall not affect the validity or the enforceability of the foregoing provisions of this Agreement.

5.    Tenant agrees that the Lease and all rights of Tenant thereunder are and shall be subject and subordinate to the Declaration as the same hereafter may be modified, amended, extended or renewed from time to time, but to the extent of any conflict between this Agreement and the Declaration this Agreement shall govern and control.

6.    This Agreement may not be modified or terminated orally, and constitutes the entire agreement between the parties with respect to the subject matter hereof. Any modification of this Agreement must be in writing signed by the party to be charged. This Agreement shall be binding upon and inure to the benefit of Condominium, Unit Owner and Tenant, and their respective successors and assigns.

7.    Unit Owner, on behalf of itself and its successors and assigns, hereby consents to the execution and delivery of this Agreement by Condominium and Tenant and further, on behalf of itself and its successors and assigns, joins in the execution and delivery hereof to evidence its agreement with Tenant that nothing contained herein shall be construed as, or shall have the effect of, diminishing, impairing or affecting in any respect the obligations of Unit Owner to Tenant under the Lease or any other instrument or the rights of Tenant thereunder. Condominium, Unit Owner and Tenant acknowledge and agree that nothing in this Agreement, nor the execution of this Agreement itself, shall be construed to waive or otherwise modify Unit Owner's responsibilities under the Declaration.

8.    The covenants and agreement herein contained shall be deemed to be covenants running with the Unit, and shall inure to the benefit of and be binding upon the parties hereto and the successors in interest of the parties hereto.

9.    Any notice or demand which, under the terms of this Agreement or under any statute, must or may be given or made by the parties hereto, shall be in writing, and shall be given by (a) personal delivery (with receipt acknowledged), (b) mailing the same by certified mail, postage prepaid, return receipt requested, or (c) delivery by nationally-recognized overnight carrier, addressed to the respective addresses set forth below:

If to Tenant:

>60 Pine Street
>New York, NY  10005
>Attention:  Mr. Mark Altherr
>with a copy to:
>
>Curtis, Mallet-Provost, Colt & Mosle LLP
>101 Park Avenue
>New York, NY  10178
>Attention:  Martin Forman, Esq.

If to Condominium:

>c/o Rose Associates
>200 Park Avenue
>New York, NY  10017
>Attention:  Mr. James Hedden
>
>with a copy to:
>
>Paul, Weiss, Rifkind, Wharton & Garrison LLP
>1285 Avenue of the Americas
>New York, NY  10019
>Attention:  Peter Fisch, Esq.

If to Unit Owner:

>c/o Rose Associates
>200 Park Avenue
>New York, NY  10017
>Attention:  Mr. James Hedden
>
>with a copy to:
>
>Paul, Weiss, Rifkind, Wharton & Garrison LLP
>1285 Avenue of the Americas
>New York, NY  10019
>Attention:  Peter Fisch, Esq.

Any party may designate by notice in writing a new or other address to which such notice or demand shall thereafter be so given, made, or mailed.  Every notice shall be deemed to have been given or served upon delivery thereof as indicated on the return receipt or other delivery receipt, with failure to accept delivery to constitute delivery for such purpose.  All notices delivered after 5:00 p.m. (Eastern time) shall be deemed delivered on the next business day.

10.    This Agreement shall be construed in accordance with the laws of the State of New York, without reference to its principles of conflicts of laws.

11.    Every provision of this Agreement is intended to be severable.  If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remainder of this Agreement.

(a)    12.    This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement with the same effect as all parties had signed the same signature page.

(b)
[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first above written.

CONDOMINIUM:

70 PINE STREET CONDOMINIUM

By: _____

      Name:
      Title:

*[Signatures Continued on Following Pages]*

<u>UNIT OWNER</u>:

EBNB 70 PINE OWNER LLC

By:   Antique Pine Rose, LLC, its Manager

     By: _____
     Name:
     Title:

*[Signatures Continued on Following Page]*

*[Unit Owner Signature Page to Condominium SNDA – New Lease]*

<u>TENANT</u>:

DOWN TOWN ASSOCIATION

By: _____
        Name:
        Title:

By: _____
        Name:
        Title:

*[Tenant Signature Page to Condominium SNDA – New Lease]*

STATE OF NEW YORK    )
                            ) ss.:
COUNTY OF NEW YORK  )

On the _____ day of December, in the year 2014, before me, the undersigned, a notary public in and for said State, personally appeared _____,
personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he or she executed the same in his or her capacity, and that by his or her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                     _____
                                           Notary Public

STATE OF NEW YORK    )
                            ) ss.:
COUNTY OF NEW YORK  )

On the _____ day of December, in the year 2014, before me, the undersigned, a notary public in and for said State, personally appeared _____,
personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he or she executed the same in his or her capacity, and that by his or her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                     _____
                                           Notary Public

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK  )

On the _____ day of December, in the year 2014, before me, the undersigned, a notary public in and for said State, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he or she executed the same in his or her capacity, and that by his or her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.


_____
Notary Public

STATE OF NEW YORK    )
                       ) ss.:
COUNTY OF NEW YORK  )

On the ____ day of December, in the year 2014, before me, the undersigned, a notary public in and for said State, personally appeared _____,
personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he or she executed the same in his or her capacity, and that by his or her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

# EXHIBIT A

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

**CHICAGO TITLE INSURANCE COMPANY**
**SCHEDULE A DESCRIPTION**

Title No.: 3112-00301

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County of New York, City and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the southerly side of Cedar Street and the westerly side of Pearl Street;

RUNNING THENCE westerly, along the southerly side of Cedar Street, 256 feet 11-1/4 inches;

THENCE southerly, through the center of a party wall between premises herein described and the premises adjoining on the West, 60 feet 8-3/4 inches to the division line between the premises herein described and the premises adjoining on the South known as No. 64 Pine Street;

THENCE easterly, along the said division line, 9 feet 3 inches to the division line between the premises herein described and the premises adjoining on the West known as No. 64 Pine Street;

THENCE southerly, along said division line and through the center line of a party wall, 72 feet 7-1/4 inches to the northerly side of Pine Street;

THENCE easterly, along the northerly side of Pine Street, 248 feet 4-1/4 inches to the corner formed by the intersection of the northerly side of Pine Street and the westerly side of Pearl Street;

THENCE northerly, along the westerly side of Pearl Street, 120 feet 3 inches to the corner formed by the intersection of the southerly side of Cedar Street and the westerly side of Pearl Street, at the point or place of BEGINNING.

SLEGAL 2/08 KMS

# EXHIBIT F

## COPY OF SECURITY DEPOSIT AGREEMENT

*[See Attached]*

## AGREEMENT (SECURITY DEPOSIT)

THIS AGREEMENT (SECURITY DEPOSIT) (this "**Agreement**") is made as of December ___, 2014 (the "**Effective Date**"), by and between EBNB 70 Pine Owner LLC, a Delaware limited liability company ("**Landlord**") and Down Town Association, a New York not-for-profit corporation ("**Tenant**"), and, acknowledged and accepted, for limited purposes as set forth below, by Chicago Title Insurance Company (the "**Escrow Agent**").

## RECITALS

**WHEREAS**, Landlord and Tenant entered into that certain Lease, dated as of April 26, 2013, as amended by that certain First Amendment to Lease, dated as of July 24, 2013 (the "**First Amendment**"), and that certain Second Amendment to Lease, dated as of the Effective Date (the "**Second Amendment**") (such Lease, as so amended, the "**Original Lease**"), pursuant to which Landlord leased to Tenant portions of the 1st and 2nd floors in the building known by the street address of 70 Pine Street, New York, NY (the "**Building**"), which leased premises consist of the "Downtown Unit" in the 70 Pine Street Condominium (the "**Premises**");

**WHEREAS**, concurrently with the Second Amendment, Landlord and EBRA 70 Pine Master Tenant LLC (together with its successors and assigns, "**Master Tenant**") entered into that certain Master Lease (the "**Master Lease**"), pursuant to which Landlord leased to Master Tenant the land on which the Building is located and the Building, including the Premises;

**WHEREAS**, pursuant to the Second Amendment, Landlord assigned to Master Tenant, and Master Tenant assumed from Landlord, all of Landlord's rights and obligations under the Original Lease arising from and after the Effective Date;

**WHEREAS**, concurrently with the Second Amendment, Master Tenant and Tenant amended and restated the Original Lease pursuant to that certain Amended and Restated Lease, dated as of the Effective Date (the Original Lease, as so amended and restated, the "**Prior Lease**");

**WHEREAS**, concurrently with the Second Amendment, Landlord and Tenant entered into that certain Lease (the "**Subsequent Lease**"), pursuant to which Landlord will lease to Tenant the Premises, commencing after the expiration or termination of the Master Lease, subject to the terms of the Subsequent Lease (capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Subsequent Lease); and

**WHEREAS**, Landlord and Tenant desire to enter into certain additional agreements with respect to the Security Deposit.

**NOW THEREFORE**, in consideration of the foregoing and the terms, covenants and conditions contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each party, the parties hereby agree as follows:

1.    Upon the expiration or earlier termination of the Master Lease, if the Subsequent Lease is then in full force and effect, Tenant shall direct, if Tenant is then entitled to the return of the "Security Deposit" (as defined in the Prior Lease), Master Tenant to deliver the letter of credit then held by Master Tenant or delivered to Master Tenant by the "Escrow Agent" (as defined in the Prior Lease), as applicable, as the "Security Deposit" (as defined in the Prior Lease) to Landlord to be held as the Security Deposit, by Master Tenant submitting a notice of transfer of such letter of credit (together with the original letter of credit) to the issuing bank (with Landlord as the transferee).  Upon or prior to the expiration or earlier termination of the Master Lease, Landlord shall send a written reminder to Tenant reminding Tenant to send such direction to Master Tenant (such written reminder from Landlord to Tenant, the **"Reminder"**), if Tenant is then entitled to the return of the "Security Deposit" (as defined in the Prior Lease). Notwithstanding anything in the Prior Lease to the contrary, (i) if Tenant fails to deliver such direction to Master Tenant within two (2) business days of the receipt of the Reminder, Landlord shall have the right to give such direction to Master Tenant on Tenant's behalf (and Master Tenant shall have no liability to Tenant or any other Person for complying with any such direction from Landlord) and (ii) from and after the expiration or earlier termination of the Master Lease, if Tenant is then entitled to the return of the "Security Deposit" (as defined in the Prior Lease), (1) the letter of credit then held as the "Security Deposit" (as defined in the Prior Lease) shall be deemed to constitute the letter of credit held as the Security Deposit for all purposes under the Subsequent Lease (including with respect to Landlord's right to exercise all rights and remedies with respect to such letter of credit as and when permitted under the terms of the Subsequent Lease) and (2) prior to the reissuance of the letter of credit constituting the "Security Deposit" (as defined in the Prior Lease), naming Landlord as the beneficiary, as set forth in this <u>Section 1</u>, Landlord shall have the right to direct Master Tenant as necessary or appropriate for Landlord to exercise any rights and remedies with respect to such letter of credit deemed to constitute the letter of credit held as the Security Deposit in accordance with the terms of the Subsequent Lease, including the right to direct Master Tenant to require the Bank to pay to Master Tenant the entire proceeds of the letter of credit and Master Tenant to pay such proceeds to Landlord if and when Landlord is entitled to draw on the letter of credit held as the Security Deposit pursuant to the terms of the Subsequent Lease.

2.    If the Commencement Date shall have occurred prior to Landlord's receipt of the re-issued letter of credit (with Landlord as the named beneficiary thereunder), as described in <u>Section 1</u> above, then Landlord shall hold such re-issued letter of credit as the Security Deposit in accordance with the terms of the Subsequent Lease.

3.    If the Commencement Date shall not have occurred prior to Landlord's receipt of the re-issued letter of credit (with Landlord as the named beneficiary thereunder), as described in <u>Section 1</u> above, then Landlord shall deliver such re-issued letter of credit to the Escrow Agent to be held in escrow as set forth in <u>Section 4</u> below.

4.    If any such re-issued letter of credit is delivered to the Escrow Agent as set forth in <u>Section 3</u> above, (i) such letter of credit shall be held by the Escrow Agent on behalf of Landlord as the Security Deposit, (ii)  the terms of Section 35.1 of the Prior Lease (except the first three sentences thereof) and Section 35.5 of the Prior Lease shall be deemed incorporated into the Subsequent Lease as set forth in Section 35.1 of the Subsequent Lease and the Escrow

Agent shall be a third-party beneficiary of the terms so incorporated into the Subsequent Lease and (iii) the terms of Section 35.1 of the Prior Lease (except the first three sentences thereof) and Section 35.5 of the Prior Lease shall govern the respective rights and obligations of Landlord and Tenant, and the duties and rights of the Escrow Agent, with respect to the Security Deposit so held by the Escrow Agent, in each case, with the following modifications:

(i)     the term "Security Deposit" used therein shall be deemed to mean the Security Deposit;

(ii)     the term "Landlord" used therein shall be deemed to mean Landlord;

(iii)     the term "Tenant" used therein shall be deemed to mean Tenant;

(iv)     the term "Commencement Date" used therein shall be deemed to mean the Commencement Date;

(v)     the term "Lease" used therein shall be deemed to mean the Subsequent Lease;

(vi)     the reference in the fifth sentence of Section 35.1 thereof to "Section 1.2(c)(iii)" shall be deemed to refer to Section 1.2(h)(iii) of the Subsequent Lease;

(vii)     the reference in the last sentence of Section 35.1 thereof to "Section 35.1" shall be deemed to refer to Section 35.1 of the Subsequent Lease;

(viii)     the reference in the last sentence of Article 35 thereof to "Article 35" shall be deemed to refer to Article 35 of the Subsequent Lease; and

(ix)     the reference in the last sentence of Section 35.1 thereof to "Section 35.2" shall be deemed to refer to Section 35.2 of the Subsequent Lease.

5.     Landlord agrees that, solely in connection with (i) the Second Amendment and the reissuance of the letter of credit currently held as the "Security Deposit" under the Prior Lease to name Master Tenant as the beneficiary thereof and (ii) the expiration or earlier termination of the Master Lease, if the Subsequent Lease is then in full force and effect, and the reissuance of the letter of credit then held as the "Security Deposit" under the Prior Lease to name Landlord as the beneficiary thereof, as described in Section 1 above, Landlord shall pay any transfer fee (but not any other fee or other amount) charged by the issuer of such letter of credit upon such reissuance of such letter of credit.  Tenant acknowledges that (x) Landlord's agreement under this Section 5 shall not, and shall not be deemed to, modify the terms of the Subsequent Lease except for the limited purposes and limited instances expressly set forth in this Section 5 and (y) Landlord shall not have any obligation to pay any transfer or other fees charged by any issuer of any letter of credit held under the Prior Lease or the Subsequent Lease except in connection with the Second Amendment and any letter of credit transferred to Landlord at the expiration or earlier termination of the Master Lease as expressly set forth in this Section 5.

6.      This Agreement shall (i) be governed by and construed in accordance with the laws of the State of New York (without reference to its principles of conflicts of laws) (ii) be binding on the parties and their successors and assigns and (iii) inure to the benefit of the parties and their permitted successors and permitted assigns under the terms of the Subsequent Lease.

7.      This Agreement may be executed in counterparts and shall constitute the agreement of the parties whether or not their signatures appear in a single copy hereof.  The exchange of executed counterparts of this Agreement among the parties by means of facsimile transmission or by electronic email transmission (pdf) shall constitute a valid exchange of this Agreement and shall be binding upon the parties hereto.

IN WITHNESS WHEREOF, the parties have caused this Agreement to be executed the day and year first above written.

**Landlord**:

EBNB 70 PINE OWNER LLC

By:    Antique Pine Rose, LLC, its Manager

By: _____
Name:    Adam R. Rose
Title:    Manager

*[Signatures Continued on Following Page]*

*[Landlord Signature Page to Agreement (Security Deposit)]*

**Tenant**:

DOWN TOWN ASSOCIATION

By: _____
     Name:  Mark Altherr
     Title:  President


By: _____
     Name:  Timothy L. Thompson
     Title:  Secretary

*[Tenant Signature Page to Agreement (Security Deposit)]*

**Tenant**:

DOWN TOWN ASSOCIATION

By: _____
    Name:  Mark Altherr
    Title:  President

By: _____
    Name:  Timothy L. Thompson
    Title:  Secretary

*[Tenant Signature Page to Agreement (Security Deposit)]*

The undersigned has executed this Amendment solely to confirm its acceptance of the duties of the Escrow Agent as set forth in Section 4 of this Agreement.

**Escrow Agent**:

CHICAGO TITLE INSURANCE COMPANY

By: _____

Name:   ELLIOT L. HURWITZ
Title:   Chief Commercial Counsel

*[Escrow Agent Signature Page to Agreement (Security Deposit)]*